## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | |
|---|---|
| **LINDA JEAN QUIGG,  Ed. D.,** | |
| Plaintiff, | |
| v. | Civil Action No.  7:12-CV-153 (HL) |
| **THOMAS COUNTY SCHOOL DISTRICT; CHARLES EVANS, Individually; NANCY HIERS, Individually; SCOTT MORGAN, Individually; CLARK NeSMITH, Individually; and KAY STREET, Individually,** | |
| Defendants. | |

### FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Linda Jean Quigg, Ed. D., and shows the Court the following for her Complaint against Defendant Thomas County School District:

### Parties

1.

Plaintiff Linda Jean Quigg, Ed. D., ("Dr. Quigg") is a citizen of the United States and she resides in Oconee County, Georgia.

2.

Dr. Quigg is a female.

3.

Defendant Thomas County School District ("the School District") is a corporate body having its principal place of business in Thomasville, Thomas County, Georgia.  All of the actions described herein were accomplished under color of state and local law by the body

persons possessed of final policymaking authority with regarding to the hiring, firing, and terms and conditions of employment the School District Superintendent.

4.

At all times relevant to this action, Defendants Charles Evans, Nancy Hiers, Scott Morgan, Clark NeSmith, and Kay Street ("the individual defendants") were members of the Thomas County Board of Education who, collectively, made the decision to terminate the employment of Plaintiff Quigg.

**Jurisdiction and Venue**

5.

This Honorable Court possesses subject matter jurisdiction over this civil action because it arises under the laws of the United States. 28 U.S.C. § 1331; 42 U.S.C. § 2000e *et seq*; 42 U.S.C. Sec. 1983. Upon information and belief, each defendant resides within the Middle District of Georgia and is subject to the personal jurisdiction of this Court.

6.

Venue is proper in the Valdosta Division of the United States District Court for the Middle District of Georgia because jurisdiction is not founded on diversity and a substantial part of the events and omissions giving rise to the claims in this action occurred in Thomas County, Georgia which is in the Valdosta Division of the Middle District of Georgia.

**Facts**

7.

The School District is a person engaged in an industry affecting commerce who has more than 15 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

8.

The School District is subject to the control and management of the Thomas County Board of Education ("the Board of Education."). The Board of Education possesses final policymaking authority with respect to the hiring, firing, and terms of conditions of the School District's Superintendent.

9.

The School District, by and through the Board of Education, has established and it operates and maintains a public school system for the school-age children of Thomas County, Georgia.

10.

The School District's School Superintendent (the "Superintendent") is the School District's Chief Executive Officer and has charge of the day-to-day administration of the School District.

11.

The Superintendent is appointed by the Board of Education and employed by the School District.

12.

Dr. Quigg was appointed Superintendent by the Board of Education and Dr. Quigg was employed by the School District as Superintendent on June 1, 2007.

13.

The School District involuntarily terminated Dr. Quigg from the Superintendent position on June 1, 2011. At the time of her termination, Plaintiff Quigg, based on her training, education, experience and history of excellent work performance, Plaintiff was "qualified" to remain in the position.

14.

The School District, acting through the individual defendants,  replaced Dr. Quigg as Superintendent with a male employee.

15.

Dr. Quigg was treated differently than her male successor with respect to compensation, terms, conditions and privileges of her employment as Superintendent.

16.

The Board of Education as it was comprised at the time of Dr. Quigg's discharge never evaluated or assessed Dr. Quigg's performance as Superintendent in a timely manner.  For example, under the terms of Dr. Quigg's Contract of Employment as Superintendent, the Board of Education was required to evaluate and assess Dr. Quigg's performance for the 2009-2010 school year in June 2010.  The Board of Education, however, did not evaluate or assess Dr. Quigg's performance for the 2009-2010 school year until December 2010.  Even though it failed to evaluate or assess Dr. Quigg's performance in a timely manner, the Board of Education as it was comprised at the of time of Dr. Quigg's discharge, has always timely evaluated and assessed the performance of Dr. Quigg's male successor.

17.

While Dr. Quigg was Superintendent, the Board of Education impermissibly involved itself with the day-to-day operations of the School District, particularly personnel matters.  As a result, the Board of Education made it more difficult for Dr. Quigg to perform the duties and responsibilities of her job.  The Board of Education has not engaged in such conduct with respect to Dr. Quigg's male successor.   To the contrary, the Board of Education agreed to leave Dr.

Quigg's male successor alone if he would accept the School District's offer to become Superintendent.

18.

The Board of Education required Dr. Quigg to advertise vacant positions, post vacancy notices, send e-mails to staff members, and conduct interviews of potential candidates before it would approve any person Dr. Quigg recommended to fill vacant positions. The School District has not imposed the same requirements upon Dr. Quigg's male successor. For example, Dr. Quigg's male successor recommended that Board Member Charles Evans' daughter, who was not an employee of the School District at the time, be hired as an academic coach. Dr. Quigg's male successor did not advertise the vacant position, post a vacancy notice, send an e-mail to staff members about the vacancy or conduct interviews of potential candidates before making the recommendation. Even so, the Board of Education approved the recommendation.

19.

Before deciding to discharge Dr. Quigg, the Board of Education told Dr. Quigg that the next administrative position she filled would have to be filled by a person that was already employed by the School District. Dr. Quigg's male successor has been allowed to fill administrative positions with persons not already employed by the School District.

20.

The Board of Education required Dr. Quigg to reduce the number of System-Level Administrators employed by the School District. Dr. Quigg's male successor has been allowed to increase the number of System-Level Administrators employed by the School District so that there are now more System-Level Administrators employed by the School District than at any time Dr. Quigg served as Superintendent.

21.

As to the System-Level Administrators and others employed by the School District while Dr. Quigg was Superintendent, the Board of Education required Dr. Quigg to reduce the terms of their contracts from 12 months to 11 or 11.5 months.  Dr. Quigg's male successor has been allowed to return the terms of the contracts of many of those same employees to 12 months.

22.

The Board of Education required Dr. Quigg to reduce the School District's budget.  Dr. Quigg's male successor has been allowed to increase the School District's budget.

23.

Despite her requests for increases, the Board of Education refused to increase the millage rate for the School District while Dr. Quigg was Superintendent.    Now that a male is Superintendent, the School District's millage rate has been increased thus allowing the male Superintendent to have more funds to operate the School District.

24.

The Board of Education refused to allow Dr. Quigg to decide whether students who had not passed all parts of the Georgia High School Graduation Test could participate in graduation ceremonies.  Dr. Quigg's male successor now makes that decision.

25.

In accordance with her Contract of Employment as Superintendent, the Board of Education was required to evaluate and assess in writing the performance of Dr. Quigg annually in June of each calendar year.  In the event the Board of Education determined that the performance of Dr. Quigg was unsatisfactory in any respect or that Dr. Quigg needed improvement in any area of the her duties and responsibilities, the Board of Education was required to describe in writing the

unsatisfactory performance or areas needing improvement and include recommendations or directives as to how Dr. Quigg should improve her performance.

26.

The Board of Education never notified Dr. Quigg of any unsatisfactory performance or areas needing improvement.

27.

The Board of Education never provided Dr. Quigg any recommendations or directives as to how she should improve her performance.

28.

The Board of Education, by and through its Chairman (Defendant Morgan) questioned male superintendents (but not female superintendents) of other school systems about information communicated to it by Dr. Quigg.  The Board of Education has not made similar inquiries to Superintendents of other school systems regarding information communicated to them  by Dr. Quigg's male successor.

29.

On February 4, 2011, Dr. Quigg met with Board Chairman (Defendant Morgan) and Board Vice Chairman, Defendant  NeSmith.  During that meeting, Dr. Quigg told Board Members Morgan and NeSmith of her plan to fill the vacant position of Assistant Superintendent with one of two qualified females she had previously identified.   In response, Board Member Morgan asked Dr. Quigg did she not have a male for that position.   Dr. Quigg expressed her opposition to Board Member Morgan's desire to base the decision on gender.  In response Board Members Morgan and NeSmith told Dr. Quigg that she could not fill the position with either of the two females she identified.  Dr. Quigg then told Board Members Morgan and NeSmith that she

would advertise for applicants for the position and conduct interviews of qualified applicants in order to fill the position.  Board Members Morgan and NeSmith responded that Dr, Quigg could not do that.  Board Members Morgan and NeSmith told Dr. Quigg that a person already employed by the School District had to be placed in the position.

30.

Just four days after Dr. Quigg's February 4, 2011 meeting with Board Members Morgan and NeSmith, Board Member Morgan and another member of the Board of Education informed Dr. Quigg that the School District was non-renewing her Contract of Employment and discharging her as Superintendent.  When Dr. Quigg asked why, Board Member Morgan responded, "Quite frankly, I didn't like your plan."

31.

Despite Board Members Morgan and NeSmith's February 4, 2011 statements, Dr. Quigg's male successor was permitted to fill the position with a female who was not already employed by the School District.

32.

Subsequent to the  decision to discharge Dr. Quigg, at least two members of the  Board of Education, stated that Dr. Quigg was discharged because the Superintendent needs to be a "strong male."

33.

The individual Defendants acted in concert to cause the  School District to  discharge Dr. Quigg as Superintendent because of Dr. Quigg's  gender  and because  Dr. Quigg  opposed an employment practice made unlawful by Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

34.

The individual defendants knew at the time they procured Dr. Quigg's termination that discriminating against public employees based on their gender violated federal law (Title VII and the Equal Protection Clause). Their actions in procuring Dr. Quigg's termination based on her gender, therefore, constitutes willful and deliberate misconduct warranting an award of punitive damages.

35.

As a direct and proximate result of the School District having discharged Dr. Quigg as because of her sex and because of her expressed opposition to an employment practice made unlawful by Title VII, Dr. Quigg has lost income in an amount which is not capable of computation until this matter is tried to a jury.

36.

As a direct and proximate result of the School District having discharged Dr. Quigg because of her sex and because of her expressed opposition to an employment practice made unlawful by Title VII, Dr. Quigg will lose income in the future including, but not limited to, retirement income.

37.

As a direct and proximate result of the School District having intentionally discharged Dr. Quigg because of her sex and because of her expressed opposition to an employment practice made unlawful by Title VII, Dr. Quigg has suffered emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and loss of enjoyment of the her chosen profession.

38.

As a direct and proximate result of the School District having discharged Dr. Quigg because of her sex and because of her expressed opposition to an employment practice made unlawful by Title VII, Dr. Quigg will suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and loss of enjoyment of her chosen profession in the future.

39.

As a direct and proximate result of the School District having discharged Dr. Quigg because of her sex and because of her expressed opposition to an employment practice made unlawful by Title VII, Dr. Quigg has incurred medical and other expenses.

40.

As a direct and proximate result of the School District having discharged Dr. Quigg as Superintendent because of her sex and because of her expressed opposition to an employment practice made unlawful by Title VII, Dr. Quigg will incur medical and other expenses in the future.

41.

On August 3, 2011, Dr. Quigg timely filed a charge with the U.S. Equal Employment Opportunity Commission (the "Commission") alleging that the School District engaged in an unlawful employment practice by intentionally discharging her as Superintendent because of her sex and because of her express opposition to an employment practice made unlawful by Title VII (the "First Charge").

42.

The School District retaliated against Dr. Quigg because she filed the First Charge. The acts of retaliation include, but are not limited to, the following:

(a)     On September 3, 2011, the School District, by and through its attorney, falsely accused Dr. Quigg of having engaged in criminal activity and threatened legal action against Dr. Quigg because she had allegedly "cleared" her computer and had certain information stored on her computer copied before leaving the employment of the School District.   The male Superintendent that preceded Dr. Quigg had engaged in that activity but no such threats were made against him;

(b)     On September 3, 2011, the School District, by and through its attorney, falsely accused Dr. Quigg of stealing the hard drive from her computer and threatened legal action against her for allegedly doing so;

(c)     The Georgia Professional Standards Commission has the authority to revoke or suspend the certification of an educator.  Subsequent to the filing of the First Charge, the School District filed false charges about Dr. Quigg and her two daughters with the Georgia Professional Standards Commission;

(d)     The School District unlawfully disclosed confidential and private information about Dr. Quigg's daughters to the Georgia Professional Standards Commission during its investigation of the false charges the School District filed against Dr. Quigg;

(e)     The School District unlawfully disclosed confidential and private information about Dr. Quigg's daughters to others; and

(f)     The School District caused false information about Dr. Quigg to be published in the Thomasville Times-Enterprise on August 2, 2012.

43.

As a direct and proximate result of the School District having intentionally retaliated against Dr. Quigg because she filed the First Charge, Dr. Quigg has experienced emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and loss of enjoyment of her chosen profession.

44.

As a direct and proximate result of the School District having intentionally retaliated against Dr. Quigg because she filed the First Charge, Dr. Quigg will experience emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and loss of enjoyment of her chosen profession in the future.

45.

As a direct and proximate result of the School District having intentionally retaliated against Dr. Quigg because she filed the First Charge, Dr. Quigg has incurred medical and other expenses.

46.

As a direct and proximate result of the School District having intentionally retaliated against Dr. Quigg because she filed the First Charge, Dr. Quigg will incur medical and other expenses in the future.

47.

On August 6, 2012, Dr. Quigg timely filed a charge with the Commission alleging that the School District engaged in an unlawful employment practice by intentionally retaliating against her because she filed the First Charge (the "Second Charge").

48.

The Commission has given Dr. Quigg notice that she may bring a civil action against the School District in relation to the First Charge and this action is being brought within ninety (90) days after the giving of such notice.

49.

The Attorney General has given Dr. Quigg notice that she may bring a civil action against the School District in relation to the Second Charge and this action is being brought within ninety (90) days after the giving of such notice.

### Causes of Action

### I.  Title VII – Gender Discrimination

50.

Dr. Quigg adopts and incorporates herein by reference each and every allegation made in paragraphs 1 – 49 above.

51.

The School District, in violation of Title VII, intentionally discharged Dr. Quigg as Superintendent of Schools because of Dr. Quigg's gender.

### II. 42 U.S.C. Sec. 1983 Gender Discrimination

52.

Dr. Quigg adopts and incorporates herein by reference each and every allegation made in paragraphs 1 – 51 above.

53.

Defendants' termination of Dr. Quigg's employment based on her gender constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution  actionable under  42 U.S.C. Sec. 1983.

### III.  Title VII – Retaliation

54.

Dr. Quigg adopts and incorporates herein by reference each and every allegation made in paragraphs 1 – 53 above.

55.

Defendants termination of Plaintiff's employment based on her expressed opposition to an employment practice rendered unlawful under Title VII constitutes a violation of Title VII's anti-retaliation provision,  42 U.S.C. Sec. 2000e-3(a).

56.

The School District's  retaliation  against Dr. Quigg  because she filed the First Charge of Discrimination, i.e., because she participated in proceedings brought under Title VII (described above in Par. 42),  constitutes a violation of Title VII's anti-retaliation provision, 42 U.S.C. Sec. 2000e-3(a).

### Demand for Jury Trial

Dr. Quigg demands a jury trial with respect to all issues so triable.

### Prayer for Relief

WHEREFORE, Plaintiff Linda Jean Quigg, Ed. D., respectfully prays for the following relief:

(a)    The issuance of process and service of process against Defendant Thomas County School District and the individual Defendants;

(b)    Judgment in Plaintiff's favor against Defendant that includes the following:

   (i)    back pay in amount equal to the income Dr Quigg has lost, plus interest;

   (ii)    front pay in an amount equal to the income Dr. Quigg will lose in the future including, but not limited to, retirement income;

   (iii)    general damages in an amount that will fully compensate Dr. Quigg for the emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and loss of enjoyment of her chosen career Dr. Quigg has experienced and will experience in the future due to defendants' unlawful conduct;

   (iv)    medical and other expenses Dr. Quigg has incurred and will incur in the future;

   (v)    punitive damages against the individual defendants;

(c)    Reinstatement to the position of Superintendent;

(d)    An award of attorney's fees and costs of litigation as authorized by Title VII and 42 U.S.C. Sec. 1988; and

(e)    Such other relief that this Honorable Court deems just and proper.

Date:  February 22, 2013.

/s/ Harlan S. Miller
A. Lee Parks
Georgia Bar No. 563750
Harlan S. Miller
Georgia Bar No. 506709
Parks, Chesin & Walbert, P.C.
3646 Vineville Avenue
Macon, Ga., 31204

Telephone: (478) 218-8529
Facsimile (478) 477-8043
hmiller@pcwlawfirm.com