IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| LINDA JEAN QUIGG, Ed.D., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION FILE |
| | : | NO.: 7:12-CV-153 (HL) |
| THOMAS COUNTY SCHOOL | : | |
| DISTRICT,  et. al., | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

**DECLARATION OF LINDA JEAN QUIGG**
**PURSUANT TO 28 U.S.C. §1746**

1.

My name is Linda Jean Quigg. I am over the age of twenty-one and suffer from no legal disabilities. I offer this Declaration in opposition to Defendants' pending motions for summary judgment.

**I**      **Professional and Educational Background**

2.

Prior to the involuntary termination of my employment as Superintendent of the Thomas County School District in 2011, I had been actively involved in the field of Education as a Student, Educator, and Administrator for nearly thirty-seven (37) years.

3.

I graduated from Central High School (Thomas County, Ga), 1974, where I was the Valedictorian of my class.

4.

I received my B.S.Ed. in Elementary Education from the University of Georgia in 1977.

5.

I received my M.Ed. in Reading Education from the University of Georgia in 1978.

6.

I received my Ed.S. in Reading Education from Valdosta State University in 1984.

7.

I received my Ed.D in Educational Administration and Supervision from the University of Houston College of Education in 1988.

8.

From March of 1977 to June of 1977, I was employed as long-term substitute Second Grade Teacher at Garrison Pilcher Elementary School (Thomas County).

9.

From September of 1978 until August of 1980, I was employed as a 4th and 5th Grade Title I Teacher and 2nd Grade Teacher at Garrison Pilcher Elementary School.

10.

From October of 1980 until May of 1985 I was employed as a Reading Specialist at Holibrook Elementary School in Houston, Tx.,

11.

In June of 1985, I was promoted to the positoin of Assistant Principal at Hollibrook Elementary School, a position in which I continued until May of 1987.

12.

From July of 1987 until May of 1988, I was employed as an Assistant Principal at Hollibrook Elementary School in Houston, Tx.

13.

From June of 1988 until December of 1994, I was employed as a Principal at Frostwood Elementary School in Houston, Tx.

14.

After relocating with my family, from July of 1995 until June of 1998, I was employed as an Assistant Principal at Cross Creek Elementary School in Thomas County.

15.

I was promoted to the position of Assistant Superintendent of the Thomas County School District in July of 1998, a position which I held until July 1, 2007.

16.

I was named as Superintendent of the Thomas County School District in December of 2006, and formally assumed the position on July 1, 2007, a position which I occupied until 2011 when the five individual Defendants in this case voted not to renew my contract.

17.

At the time of my non-renewal, I held a certificate to teach in the State of Georgia, Certificate #247660, issued by the Georgia Professional Standards Commission ("PSC"), pursuant to which I was authorized to serve as a teacher and Administrator within the State of Georgia.

18.

Over the course of my career as an Education Professional, I have received numerous awards and special recognitions and have served on many public committees, panels, and boards, addressing educational issues, as outlined in my resume. [Doc 67-2, pp. 62-71]

**II**    **Local School Boards and Superintendents**

19.

Pursuant to constitutional and statutory provisions in Georgia, "Each school system shall be under the management and control of a board of education...". GA CONST Art. 8, § 5, ¶ II; O.C.G.A. §20–2–50 ("Each county...shall compose one school district and shall be confined to the control and management of a county board of education."). Local Boards are "without power to delegate its authority to manage the affairs of the school district." State Bd. of Educ. v. Elbert Cnty. Bd. of Educ., 112 Ga.App. 840, 146 S.E.2d 344, 348 (1965)

20.

As a consequence of this legislative  assignment of power, the duties and responsibilities of school superintendents in Georgia are "administrative" rather than "discretionary".

21.

In short,  local school boards set policy, and school  superintendents carry out such policy.  The corresponding administrative nature of the position of superintendent is  apparent from the TCSD's  own written policies. One such policy ("School Superintendent Legal Status"—Descriptor Code ABD") provides in part that the

superintendent is "charged with the duties of implementing Board policy and is responsible for the receipt and disbursement of county funds." [Doc 80-10]

22.

Another Board policy ("Board-School Superintendent Relations"–Descriptor Code BBD") also confirms the administrative nature of the position of superintendent. It provides as follows:

> The Board of Education believes that the *legislation of policies is the most important function of a school board, and that the execution of the policies should be the function of the Superintendent. Delegation by the Board of its executive powers to the Superintendent provides freedom for the Superintendent to manage the schools within the Board's policies, and frees the Board to devote its time to policymaking and appraisal functions. The Board holds the Superintendent responsible for implementing its policies...*

[Doc 80-12]

23.

At no time during my employment as Superintendent did I "formulate policy" nor was I an "appointee on the policymaking level." To the contrary, my duties and responsibilities as Superintendent were specified by statute and my employment contract, and were purely *administrative* in nature. In this regard, O.C.G.A. §20-2-109 provides as follows:

The local school superintendent shall constitute the medium of communication between the State School Superintendent and subordinate local school officers. The local school superintendent shall be the executive officer of the local board of education; shall be the agent of the local board in procuring such school equipment and materials as it may order; shall ensure that the prescribed textbooks are used by students; shall verify all accounts before an application is made to the local board for an order for payment; and shall keep a record of all official acts, which, together with all the books, papers, and property appertaining to the office, shall be turned over to the successor. It shall be the local school superintendent's duty to enforce all regulations and rules of the State School Superintendent and of the local board according to the laws of the state and the rules and regulations made by the local board that are not in conflict with state laws; and to visit every school within the local school system to become familiar with the studies taught in the schools, observe what advancement is being made by the students, counsel with the faculty, and otherwise aid and assist in the advancement of public education.

## 24.

My written employment agreements with TCSD also make clear that my duties as superintendent were "administrative" in the sense that they were limited to carrying the policies and objectives specified by the Board of Education;

     a)    The superintendent shall be the Chief Executive Officer of the district and shall have charge of *the administration of the school district under the direction of the Board of Education;*

     b)    The superintendent shall *implement all policies of the board*, rules and regulations of the State Board of

Education and State Department of Education, and all state and federal laws relevant to education and the operation of the school district;

c)   The superintendent shall be the secretary of the district's board and shall attend and participate in all meetings of the board providing *administrative recommendations* on each item of business brought before the board, except when her own employment, performance, or salary are under consideration;

d)   The superintendent shall assume responsibility for the overall planning of the school district, for the preparation of the annual budget and for submitting the budget *to the board for review and approval*.;

e)   The superintendent shall *recommend* all employees for employment and assignment by the board and shall supervise, direct, and control all employees of the district;

f)   The superintendent shall acts as a liaison between the school district and the community and shall be responsible for a program of public relations and for creating and maintaining a wholesome and cooperative working relationship between the schools and the community;

g)   The superintendent shall require such reports as she may deem necessary from principals, supervisors, teachers, or other employees and shall furnish to the state school superintendent all reports and information, which may be required from time to time;

h)   The superintendent shall stay abreast of educational trends and developments by reading widely, visiting

-8-

other systems and participating on appropriate professional organizations.

i)   The superintendent shall perform such additional duties as may be assigned from time to time by the Board and to strive to meet the performance objectives established by the Board and/or set out in this contract.

[Doc 67-2, pp. 3-6; 10-12]

25.

Considering these functions, the Georgia Court of Appeals has explicitly held that the duties of the School Superintendents are *“administrative only.”* State Bd. of Ed. v. Elbert County Bd. of Ed., 112 Ga.App. 840, 846  146 S.E.2d 344 (1965)

26.

Although local school superintendents make recommendations to their local board of education concerning the hiring and assignment of school district personnel, such recommendations are subject to the approval or disapproval of the Board of Education. O.C.G.A. §20-2-211 (“All teachers, principals, other certificated professional personnel, and other personnel of a local unit of administration shall be employed and assigned by its governing board on the recommendation of its executive officer.”); Tripp v Martin, 210 Ga. 284 (1954).

27.

Under Georgia law, local  School Superintendents do not serve "at the will of" local Boards of Education. To the contrary, Georgia law requires that there be a written contract of employment between the Superintendent and the School District (s)he serves.  O.C.G.A.  §20-2-101(a)("Superintendents of each school system shall be employed by the local board of education *under written contracts* for a term of not less than one year and not more than three years...").

28.

Pursuant to §20-1-101(a), I entered in to two written contracts with *the Thomas County School District*[1] regarding my employment as  Superintendent of the Thomas County School District. The first such contract was for the time period July 1, 2007 to June 30, 2010. [Doc 67-2, pp. 3-9]. The second such contract was for the time period July 1, 2008 to June 30, 2011. [Doc 67-2, pp. 10-16]

29.

Pursuant to my written contracts   of employment  with *the Thomas County School District*, I  could  be  involuntarily  discharged  from  employment  as

_____

[1]My employment contracts were <u>not</u> with the Thomas County Board of Education which, according to settled Georgia law, was not, and is <u>not</u> a legal entity capable of suing  or being sued.

Superintendent only for the reasons specified in O.C.G.A. §20-2-940(a). [Doc 67-2, pp. 8, 15]

30.

Pursuant to O.C.G.A. §20-2-940(a), the only grounds upon which I could lawfully be involuntarily terminated from my position as Superintendent of the Thomas County School District were as follows:

> (1) Incompetency; (2) Insubordination; (3) Willful neglect of duties; (4) Immorality; (5) Inciting, encouraging, or counseling students to violate any valid state law, municipal ordinance, or policy or rule of the local board of education; (6) To reduce staff due to loss of students or cancellation of programs and due to no fault or performance issue of the teacher, administrator, or other employee...;(7) Failure to secure and maintain necessary educational training; or (8) Any other good and sufficient cause.

31.

By the combined operation of my written employment contracts with TCSD and O.C.G.A. §20-2-940(a), at all times during my employment as Superintendent, I could be involuntarily terminated only "for cause".   At no time, therefore,   was I ever employed "at the pleasure of" the School District.

-11-

**III**   **Composition of the Board of Education**
       **During My Tenure as Superintendent**

32.

In December of 2006, I was named as the successor to long time Superintendent Dr. Larry Green. At the time I was so named, the members of the Board of Education were: John Stephenson; Cecil Stewart; Johnny Banniser; Mark Clark; Kay Streets; Kevin Reid; and Ethyl Abrams.

34.

In the 2006 election, Charles Evans defeated Kevin Reid, and Nancy Hiers defeated Ethyl Abrams. Effective January 1, 2007, the members of the Board were: John Stephenson; Cecil Stewart; Johnny Bannister; Mark Clark; Kay Streets; Charles Evans and Nancy Hiers.

35.

I officially assumed office as Superintendent on July 1, 2007.

36.

In the November 2008 election, Mark Clark did not run for reelection, and Mark Nesmith ran unopposed for his seat. Scott Morgan successfully ran against Cecil Stewart. Frank Warr successfully ran for the seat previously held by John Stephenson.

37.

As of January 1, 2009, the members of the Board were: Johnny Bannister; Kay Streets; Charles Evans; Nancy Hiers; Mark Nesmith; Scott Morgan  and Frank Warr. The same individuals remained on the Board until the time of my non-renewal.

**IV    Performance Evaluations**

38.

Pursuant to my employment contracts with TCSD [Doc 67-2, pp. 3-9; 10-16], TCSD was obligated to provide me with written performance appraisals in June of each calendar year] [Doc 67-2, pp. 6-7; Doc. 67-2, pp. 13-14] More specifically, my employment contracts provided as follows:

> The board shall evaluate and assess in writing the performance of the superintendent annually in June of each calendar year. The evaluation shall be conducted pursuant to the requirements of the Official Code of Georgia, Annotated, §20-2-210, applying the evaluation instrument adopted by the board of education for evaluating its superintendent. *In the event the board determines that the performance of the superintendent needs improvement in any area of the superintendent's duties and responsibilities, it shall describe in writing the unsatisfactory performance or areas needing improvement and include recommendations as to how the superintendent shall improve her performance.*

Id.

**A**      ***2008 Evaluation***

39.

On June 30, 2008, I received a timely performance evaluation. [Doc 66, pp. 155-157]. In each criterion on which was rated, I was judged to have met all expectations and requirements. At no time during the rating period was I ever advised by the Board, orally or in writing, that my performance was deficient in any manner; now was I advised of any steps that I should take to improve my performance.

**B**      **2009 Performance Evaluation**

40.

During October of 2009, I received a performance evaluation which was more than 90 days overdue. [Doc 66, pp. 144-152]. Therein, I was collectively rated by the Board of Education on seven separate criteria/tasks. Those criteria/tasks and the average scores I received from the members of the Board of Education (on a 1-5 scale, with five as the highest rating), were as follows:

| **Task** | **Avg. Score** |
| --- | --- |
| 1) Performs as educational leader of the schools | 3.2 |
| 2) Serves as CEO of the School Board | 2.7 |
| 3) Oversees staff personnel management | 3.0 |
| 4) Oversees operational services | 3.9 |

-14-

5) Oversees financial management                              3.2

6) Directs community relations activities                     3.0

41.

The average of these ratings (3.166) constituted the "collective" score assigned

to me by the Board of Education, a score which exceeded merely "satisfactory."

42.

At no time during the 2009 rating period was I ever advised by the Board, orally

or in writing, that my performance was deficient in any manner; now was I advised of

any steps that I should take to improve my performance, although I was provided a

"letter of understanding" expressing the Board's performance expectations, which I

addressed and accomplished during 2009 and 2010.

**C**     **2010 Evaluation**

    **1)**     **Cumulative/Collective Results**

43.

In violation of my employment agreement, as in 2009,  in 2010,  the Board of

Education did not provide me with a timely  performance evaluation.  Instead, I was

provided with a severely tardy  evaluation in December of 2010, approximately six

months late. [Doc 65, pp. 200-213]; [Exhibit "1" hereto]; [Doc 60, pp. 220-

23](Evans); [Doc 61, pp. 173-177] (Hiers); [Doc 64-3, pp. 29-34](Morgan); [Doc 66, pp. 193-196](NeSmith); [Doc 65, pp. 317-321](Streets)

44.

The 2010 performance evaluation provided to me in December of 2010 was comprised of two separate sets of measurements: "objective" factors, most notably student testing results, and "subjective" factors in which Board members rated me in each of 37 separate categories. The "subjective" factors were weighted at 60% of my overall evaluation, and the "objective" factors were weighted at 40%.

45.

The performance evaluation provided to me in December of 2010 was based on the following scale:

    0 to 1.5:      Unacceptable
    1.15 to 2.5   Needs Improvement
    2.5 to 3.5     Satisfactory
    3.51 to 4.2   Valued Performer
    4.21 to 5      High Performer

[Exhibit "1"]

46.

With regards to the "objective" component of the evaluation, I received a cumulative score of 3.54—within the *"valued performer"* category. As to the "subjective" component, I received a cumulative score of 3.07, well within the

"satisfactory" category.  The cumulative score assigned to me by the Board in my 2010 evaluation was 3.35—at the upper end of the range of "satisfactory" performance. <u>Id</u>

47.

At no time during the 2010 review period prior to the 12/2010 evaluation was I ever advised by the Board collectively (orally or in writing) that my performance was deficient in any manner; nor was I advised of any steps that I should take to improve my performance.

### 2)    2010 Evaluation: Scott Morgan

48.

The average score assigned to me by Defendant Morgan for the "subjective" categories was 3.32, at the upper end of the range of "satisfactory" performance. [Doc 64-3, pp. 29-34](Morgan); [Exhibit "1"]

49.

More specifically, Defendant Morgan's 2010 evaluation of my performance rated me as "satisfactory" or higher on 33 of 37 subjective criteria. <u>Id</u>.  Indeed Mr. Morgan rated me as a "valued performer" on 18 of the 37 criteria.  The combination of the "subjective" and "objective" ratings assigned by Mr. Morgan, equating to his overall evaluation of my performance was 4.11—in the high end of range of *"valued performer."*

50.

In the closing "comments" section of the 2010 Evaluation, Mr. Morgan stated, "I feel as a system we are doing OK." [Doc 64-3. P. 34] Based on Mr. Morgan's having rated my performance in this fashion in December, 2010, it is not credible for him to now claim that less than two months later, when the renewal vote was taken, he found my performance to be unsatisfactory and deficient so to not warrant renewing my contract.

### 3)   2010 Evaluation–Mark NeSmith

51.

The average score assigned to me by Mr. NeSmith for the subjective categories was 2.97—well within the "satisfactory" category.  [Doc 66, pp. 193-196]; [Exhibit "1"]

52.

More specifically, Mr. NeSmith rated me as "satisfactory" or higher on 28  of the 37 rating criteria.

53.

The combination of  the "subjective" and "objective" ratings assigned by Mr.NeSmith, equating to his overall evaluation of my performance was 3.90—in the high end of range of *"valued performer."*

54.

In the closing comments section of the 2010 Evaluation, Mr. NeSmith included the following: "Financially, I think the system has fared well under Dr. Quigg, which is to be commended in these tough economic times. Student performance seems to be holding its own." [Doc 66, p. 196]  Based on Mr. NeSmith's  having rated my performance in this fashion in December, 2010, it is not credible for him to now claim that  less than  two months later, when the renewal vote was taken,   he found my performance to be so  unsatisfactory and deficient as to warrant not renewing my contract.

### 4)    2010 Evaluation–Frank Warr

55.

The average score assigned to me by Board Member Frank Warr regarding the "subjective" criterion was "4.43"—well within the highest performance category ("high achiever"). [Exhibit "1"]

56.

The combination of  the "subjective" and "objective" ratings assigned by Mr. Warr, equating to his overall evaluation of my performance was 4.79—in the high end of range of *"High Performer"*. Id

### 5)    2010 Evaluation–Johnny Bannister

57.

The average score assigned to me by Board Member Johnny Bannister regarding the "subjective" criterion was "4.24"—well within the highest performance category ("high achiever"). Id

58.

The combination of the "subjective" and "objective" ratings assigned by Mr. Bannister, equating to his overall evaluation of my performance was 4.66—in the high end of range of *"High Performer"*.

**6)** **2010 Evaluation—Kay Streets**

59.

The average score assigned to me by Ms. Streets for the subjective categories was 2.19—slightly below the "satisfactory category. [Doc 65, pp. 317-321]; [Exhibit "1"]

60.

The combination of the "subjective" and "objective" ratings assigned by Ms. Streets, equating to her overall evaluation of my performance was 3.43—at the upper end of the range of satisfactory performance. Based on Ms. Streets having rated my performance in this fashion in December, 2010, it is not credible for her to now claim that less than two months later, when the renewal vote was taken, she found

my performance to be so unsatisfactory and deficient as to warrant not renewing my

contract.

### 7)   2010 Evaluation—Nancy Hiers

61.

The average score assigned to me by Ms. Hiers for the subjective categories was

2.11—somewhat below the "satisfactory category.  [Doc 61, pp. 173-177]; [Exhibit

"1"]

62.

The combination of the "subjective" and "objective" ratings assigned

by Ms. Hiers, equating to her overall evaluation of my performance was 3.39—at the

upper end of the range of satisfactory performance. Id Based on Ms. Hiers's having

rated my performance in this fashion in December, 2010, it is not credible for her to

now claim that less than two months later, when the renewal vote was taken,  she

found my performance to be so unsatisfactory and deficient as to warrant not renewing

my contract.

### 8)   2010 Evaluation—Charles Evans

63.

The average score assigned to me by Mr. Evans  for the subjective categories was 2.19—somewhat below the "satisfactory category. [Doc 60, pp. 220-223]; [Exhibit "1".]

64.

The combination of  the "subjective" and "objective" ratings assigned by Mr. Evans, equating to his  overall evaluation of my performance was 3.39—at the upper end of the range of satisfactory performance. Id  Based on Mr. Evans's  having rated my performance in this fashion in December, 2010, it is not credible for him to now claim that  less than  two months later, when the renewal vote was taken,   he found my performance to be so  unsatisfactory and deficient as to warrant not renewing my contract.

## V     January and February 2011 Meetings With Morgan and NeSmith

65.

Immediately prior to the 2/8/2011 meeting in which the Board voted not to renew my contract, I met on three occasions with Defendants Morgan and/or NeSmith to discuss various school district issues, including the extension of my contract. Specifically, I met with Mr. NeSmith alone on January 24, 2011, and met with Mr. Morgan and Mr. NeSmith together on January 26, 2011, and February 4, 2011. Each of those meetings was tape recorded.

-22-

66.

The transcript of the meeting held on January 24, 2011 is attached hereto as Exhibits "2" (pp. 1-30); "3" (pp. 31-76) and "4" (pp. 77-97). The transcript of the meeting held on January 26, 2011 is attached hereto as Exhibit "5" (pp. 1-44) and "6" (pp. 45-91). The transcript of the meeting held on February 4, 2011, was previously submitted by the Defendants as an Exhibit to my deposition in this case. [Doc 67-3], and is attached hereto as Exhibit "7" (pp. 1-129) These transcripts accurately and correctly reflect the substance of what was said during each meeting.

67.

On January 24, 2011, I met with Defendant Mark NeSmith regarding issues being faced by the school district. During the meeting, Mr. NeSmith raised the subject of appointing an "Assistant Superintendent". [Exh. "2", pp. 19-20]

68.

During the conversation, Mr. NeSmith stated that because I was so busy with the overall administration of the school district, it might be wise to appoint an "Assistant Superintendent", referencing that position with the descriptor **"axe man."** [Exh "2", p.18]

69.

Later in the conversation he suggested a particular person—Lee Bailey

(male) as someone to potentially consider for the Assistant Superintendent position. [Exhibit "3", pp. 32-33] The subject was left open at the conclusion of the meeting. Mr. NeSmith did <u>not</u> suggest Trista Jones (female) for this position during the 1/24/2011 meeting.

70.

Mr. NeSmith also told me during the January 24 meeting  meeting that:

- "You're  one of the sweetest women I know" [Exhibit "2" pp. 23-24]

- "I really admire and respect you" [Exhibit "3", p. 65]

- "Board members have behaved so terribly and put some of this load on you." [Exhibit "4",   pp. 80-81]

- "The ones that are not your strong advocates on the Board, they feed off of negative criticism" [Exhibit "3", p.65]

71.

During the meeting, Mr. NeSmith indicated that he and Scott Morgan had been having individual meetings with other members of the Board for the purpose of attempting to arrive at solution whereby my contract as Superintendent would be renewed. [Exhibit "2", p. 21]

72.

Subsequently, on January 26, 2011,   I met with Mr. Nesmith and Mr.

-24-

Scott Morgan.  Mr. Morgan opened the discussion by stating that: "one of our main goals this year is to make sure or somehow get the Board to where they are a functioning unit." [Exh. "5", p.2]

73.

Mr. Morgan thereafter stated that "we'd like for you to look at hiring a number two...This is nothing toward Dr. Quigg, I think you're one of the smartest people I know in a dibble...we need someone to be a buffer between you and the schools...." [Exh. "5", p.5]  Mr. Morgan, as Mr. NeSmith had done previously, referred to this position as a "**hatchet man"** [Exh. "5", p. 8] To his credit, Morgan later changed his nomenclature, stating,  "I think you need a hatchet *person."* [Exhibit "5", p.16]

74.

Elaborating on the "axe-man"-"hatchet man" idea, Mr. Morgan explained as follows:

> Now, you could get that person, that person follows it on down to the Principal, it makes sure it gets down to the teachers. And we're hoping that cuts down on some of the communications problems, or you don't have to stay on that Principal. *All you have to do is get this **guy** here and say, you make sure you report back to me.* [Exh. "5", pp. 8-9]

75.

Mr. Morgan added, "with that buffer in there, we want Dr. Quigg as

CEO Superintendent of our school system. We have got the Board to, you know, if something like this was to take place, they will throw their—there may be a couple that will not vote–but they have promised that they will throw their entire support for this one year to see if it works. And if it works, we'll address the long term." [Exh. "5", p.9] Mr. Morgan later added, "We're going to give you a chance. We're going to give you a year." [Exh. "5", p.26]

76.

Mr. Morgan later indicated that "we're trying to put this person, you know, advise you to put this person in there so we can buffer you from this. I mean, that's the only thing we could get the board to agree with right now." [Exh. "5", pp. 20-21]

77.

Elaborating, Mr. Morgan later stated, "the only thing we've got on the table that we can get enough votes to do is a one year contract with some though process of hiring somebody into that position." [Exh "5", p. 30]

78.

In response to my question, "what are they going to do when they're not out there being a hatchet man" [Exh "5", p.28] Mr. Morgan replied, "You could combine this position with curriculum." Id.  Elaborating, Mr. Morgan stated, "we're

-26-

not looking to hire another administrator, we're looking somehow to reorganize what we've got." [Exh. "5", p.30]

79.

I indicated to Mr. Morgan and Mr. Nesmith during the meeting that, "absolutely, I am willing to look at some reorganization." [Exh "5", p.34]

80.

When I told Mr. Morgan and Mr. NeSmith that the only internal candidate who I felt was qualified to be the "hatchet man" and handle curriculum, was a female, Tonya Johnson, Mr. NeSmith stated, "the person mentioned was not Tonya Johnson, it was Lee Bailey." (Male) [Exh "5", p. 28]

81.

When I inquired as to who should be selected for the new position, Mr. Morgan stated "Someone that's affable, someone that's committed to our system and what you're doing." [Exh. "5", p.24], adding "we're not necessarily saying that you have to hire someone. [Exh. "5", p.25] Indeed, Mr. Morgan stated that "I can't in good conscience vote for something that included another administrative position." [Exh. "6", p.64]

82.

When I inquired of Mr. Morgan as to whether the "hatchet man" suggestion

was a condition of my continued employment [Exh "6", p. 74],  he replied, "I did not

say that was a condition of your employment...I'm a lot smarter than that." Id.

83.

During the 1/26/11 meeting, the conversation turned to a decision I had made

to transfer Trista Jones to the Middle School. I then mentioned a male, Clay, that I had

hired as Assistant Principal at Cross Creek under a female Principal, Tonya Johnson.

When I said that we had put together a great team at that school, Mr. NeSmith stated,

**"I've been asking you to put a guy over there for years...".** [Exh. "6", p. 64]

84.

I responded to Mr. NeSmith's suggestion that I should base my  personnel

recommendations on *gender*,  stating, **"I am uncomfortable with something like**

**that." Id.**

85.

Incredibly,  Mr. Morgan then immediately stated, with reference to the "hatchet

man" position, "what about a **guy** for this position?" [Exh. "5", p. 64] elaborating that:

> ..I'm just saying, you know, and my wife thinks the same
> thing because, you know, and I'm just going to be honest;
> another board member as an example...And I'm just being
> honest about that, you know, **a guy will,**  and I was just
> thinking from the standpoint of an offset. [Exh. "6", pp.64-
> 65]

86.

During the 1/26/11 meeting, Mr. Morgan also made the following comments:

- "If we didn't think we were on the right road, we'd just cut the strings now" [Exh "6", p.79]

- "There are so many things that I think your abilities are, you have us on the cutting edge of a whole hell of a lot of things and we look to be on the cutting edge of a whole lot more things" [Exh. "5", p.8]

- "we think you have the abilities to be progressive and lead this system"[Exh. "6", p.63]

- "The majority of the board buys into what you're doing" [Exh. "6", p. 68]

87.

In reference to criticisms directed at me by other Board members, Mr. Nesmith stated, "We're going to do our best to keep the useless chatter and the frivolous stuff off you..." [Exh. "5", p 43]

88.

On February 4, 2011, I met again Mr. Morgan and Mr. Nesmith. During the meeting, consistent with their prior comments, I proposed a reorganization, whereby three employees, Tonya Johnson, Trista Jones, and Veronica Glee would be elevated to curriculum specialists, and other changes effected. [Exh. 7, pp. 33-37]

89.

Mr. Morgan and Mr. Nesmith expressed their disagreement with my proposal. [Exh. "7", pp. 38-48], at which point the discussion returned to the subject of the "hatchet man" Assistant Superintendent position. Elaborating, Mr. Morgan stated, "I really think we need some...sort of Chief Operating Officer." [Exh. "7", p. 59]

90.

Ultimately, I told Mr. Morgan and Mr. Nesmith that if I were to choose a "No. 2", that it would be Jeneane Weir [female]. [Exh. "7", p. 67] Thereafter, the following exchange occurred:

Mr. Morgan:     ***We have no males in the school system?***

Ms. Quigg:      No males?

Mr. Morgan:     Uh-huh.

<u>Id</u>.

91.

When asked to explain this comment in his deposition, Mr. Morgan implied that gender based employment decisions were appropriate in light of his belief that "80% of the hires we've had were females." [Doc. 64-2 p.16](Morgan Depo. P. 133)

92.

Later during the 2/4/11 meeting,  Mr. Morgan explained, "Let me give you

an example, and I hate this example because somebody gave it to me. Let's use Thomason [sic] City Schools for example. Okay, Dusty [Kornegay] pretty much handles everything from Sabrina and that comes from a couple of board members." [Exh. "7", p.71]

93.

At the time, Dusty Kornegay (my ultimate male replacement) held the position of "Assistant Superintendent" of the Thomasville City Schools. Sabrina Everett (female) held the position of Superintendent of the Thomasville City Schools.

94.

Grasping the message (i.e., hire a male "hatchet man" as my No. 2), I mentioned two potential male candidates, Scott James and Joey Holland, but indicated that I did not feel they were well suited for the position. [Exh. "7", pp. 71-72], but those suggestions were not well received.

95.

Once again, I explained that Jeneane Weir would be my choice to fill the position because she had "the most experience and the most respect of anybody." [Exh. "7", 77]. I later repeated that suggestion several more times. [Exh. "6", pp. 95, 105]

96.

Mr. Morgan stated during the meeting that "I'm not unhappy with you in the least". (Exh. "7", p.54), and "My problem is not with you" (Exh. "7", p.84)

97.

Consistent with these statements, Mr. Morgan testified on deposition as follows:

> I was trying to save Dr. Quigg...I thought she had some great qualities, that with some good coaching and some changes in the system, that she could be the superintendent we need for the next few years.

[Doc 64-1, p.53] (Morgan Depo. P. 111)

98.

Consistent with these comments, after my non-renewal, Mr. Morgan offered to do anything he could to help me find another position, including writing me a reference/recommendation—something that he presumably would not have done if he truly felt that I was a liar and deceiver.

99.

During his deposition, Mr. Morgan confirmed that he had in fact secured the *unanimous* support of the Board to grant me a one year contract extension. [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)

## VI   Plans Submitted To The Board

100.

In light of my discussions with Mr. Morgan and Mr. NeSmith, I presented two written plans to Mr. Morgan to address concerns they had related to me.

101.

On February 7, 2011, I transmitted a revised plan to Morgan. [Doc 64-3; 64-4] Therein, I expressly recommended a reorganization which included a recommendation that two females be selected for new "curriculum" positions (Jeneane Weir, secondary curriculum officer; Tonya Johnson, elementary curriculum officer.").

## VII   False Justifications Offered Up By Defendants

### A   Mark NeSmith

102.

Contrary to Mr. NeSmith's Responses to Interrogatories [Doc 66, p.179] and his Declaration [Doc 57-5, pp.2-3] at no time during the Jan-Feb 2011 meetings with Mr. NeSmith and Mr. Morgan,   nor at any time during the 2010 evaluation process  did he indicate any belief that  a decline  in student enrollment in the Thomas County School District, and any resulting decline of state revenues was grounds for not-renewing my contract.  To the contrary, the meeting revolved around Mr. NeSmith's desire to arrive at a solution whereby I would continue to serve  as Superintendent.

103.

Contrary to Mr. NeSmith's Responses to Interrogatories [Doc 66, p.179] and Declaration [Doc 57-5, p.3],   at no time during the January 24, 2011, January 26, 2011, or February 4, 2011  meetings did Mr. NeSmith indicate that he felt "we had a weak principal at the High School." To the contrary, Mr. NeSmith made the following comments about the Principal (Joe Sharp):  "I like Joe. I think he can do a wonderful job...Every time I've met with Joe, he's been fine...Joe's addressed everything..."

104.

Contrary to Mr. NeSmith's Declaration [Doc 57-5, p.3], at no time during the January and February meetings, and at no time during the 2010 evaluation process, did he ever  express any concern whatever as to any perceived "slippage" in  TCSD   test scores as compared to the City of Thomaston schools. Quite to the contrary, in his summary comments on my 2010 evaluation, Mr. NeSmith stated, " Student performance seems to be holding its own." [Doc 66, p. 196].  Additionally, when asked in interrogatories to state each and every reason he voted not to renew my contract, Mr. NeSmith made no mention whatever of any "concern" regarding test scores. [Doc 66, pp. 179-180]

105.

Contrary to Mr. NeSmith's Declaration [Doc 57-5, p.3], at no time did Mr. NeSmith suggest Trista Jones as a possible candidate for the "hatchet man" position.

106.

Contrary to Mr. Nesmith's responses to Interrogatories [Doc 166, pp. 179-180], at no time during the January 24, 2011 meeting (or subsequent meeting or communication) did I "refuse to make any concessions." To the contrary, I expressed my willingness to recommend a reorganization. Mr. NeSmith's assertion in his Declaration [Doc 57-5, p.4] that I "refused to make any further changes" is simply false.

107.

Mr. NeSmith's assertion in his Declaration [Dco 57-4, p.4] that I never expressed opposition to unlawful gender-based employment decisions is false; I did in fact express such opposition. I did so by telling Morgan and NeSmith on January 26, 2011 that "I am not comfortable" with engaging in such conduct, [Exh. "5", p. 64], and by refusing their demands to hire/appoint based on gender.

108.

Mr. NeSmith's assertion in Declaration that he would not have voted to reappoint me if I recommended a male assistant superintendent "if [my] proposed candidate did not have close ties to the high school" [Doc 57-5, p.4] is demonstrably false. First, at no time was I ever told that the Assistant Superintendent had to have

"close ties to the high school." Second, after I was non-renewed, my male successor, Dusty Kornegay, was permitted to hire a female Assistant Superintendent" from outside the School System altogether. [Doc 62-2, p.13](Morgan Dep. P. 130]; [Doc 80, p.66](Kornegay Dep. P. 65]

109.

Contrary to the statements in Mr. NeSmith's Declaration [Doc 57-5, p. 2], I did not have control over the number of students enrolled in Thomas County Schools. Any decline in enrollment was the product of age demographics beyond my control, meaning that more children graduated or otherwise left the system each year than new students entering the system.

110.

The real reason that Mark NeSmith voted not to renew my contract was my gender, because it was NeSmith's view that "it was time to put a man in there"; "Its time for a man"; "we need a man" (Barrett Deposition, pp. 27, 30, 31)

**B   Scott Morgan**

111.

In his responses to Interrogatories, Defendant Morgan was asked to identify each and every reason why he voted not to renew my contract. [Doc 64-3, p.4]. His responses are demonstrably false.

-36-

112.

Mr. Morgan's first "reason" for voting not to renew my contract,   that "I no longer trusted Dr. Quigg to give full and accurate details to the Board",  [Doc. 64-3, p.5], is demonstrably false.  In support of that "reason" Morgan cited  to two alleged incidents that occurred long before December 2010. <u>Id</u> The first alleged incident was that he had been given "an explanation as to why the 'dual enrollment' policy had been changed." which turned out to be "false".   <u>Id</u>. As Morgan testified on deposition, the change in the dual enrollment policy was approved by the Board in 2009, long before the non-renewal decision, and therefore, long in advance of Mr. Morgan's herculean efforts to secure me a contract extension.   [Morgan dep. Pp. 89-93]   Had Morgan believed in January-February of 2011  that I had deliberately provided him with false information regarding the change in the dual enrollment  policy, surely he would not have gone to such lengths to secure me a contract extension.

113.

The "dual enrollment policy" explanation is false for another reason, as Morgan admitted on deposition: Morgan did not believe that I had provided "false" information regarding the change in the dual enrollment policy until long after I was non-renewed. [Doc 64-1, pp. 32, 37](Morgan Dep. Pp.  90, 95). Obviously, therefore,  the dual enrollment policy was <u>never</u> a factor relied on by Morgan in voting not to renew my contract.

114.

The second "trust" factor that Morgan referenced in his interrogatory responses concerned information contained in an audit performed by a third party, to the effect that the Board of Education had been kept abreast on SPLOST projects. [Doc. 64-3, p.5] [Doc. 64-1, p. 43](Morgan Depo. P. 101)   However, Morgan admitted on deposition that this event allegedly occurred in 2009. [Doc 64-1, p.42] (Morgan Dep. P. 100) It defies imagination to accept Morgan's simultaneous contentions that he came to believe that I was a liar-deceiver in 2009, and yet that he  made a herculean efforts to secure me a contract extension in 2010-11. [Doc 64-3, p.6]("In late January or early February 2011,  Mark NeSmith and I convinced the Board to give Dr. a one year contract....". ]

115.

For the same reasons identified in Pars. 112 and 113, Mr. Morgan's Declaration testimony as to the "dual enrollment policy" and "SPLOST" [Doc. 57-4, p.3] is unworthy of credence and constitutes an obvious post hoc effort to conjure up justifications for his actions.

116.

Contrary to Mr. Morgan's  Responses to Interrogatories [Doc 64-3, p.5]  and his Declaration [Doc 57-4, p. 3]   at  no time during the Jan-Feb 2011 meetings with Mr. NeSmith and Mr. Morgan,   nor at any time during the 2010 evaluation process did he indicate any belief that  a decline  in student enrollment in the Thomas County School District, and any resulting decline of state revenues was my fault or responsibility or that such decreased enrollment constituted grounds for not-renewing my contract.   Once again, had Morgan truly felt the decline in enrollment was justification for not renewing my contract, he would not have sought a one year contract extension on my behalf.

117.

Mr. Morgan's third claimed reason for voting not to renew my contract was that he felt I was "getting too far down in the weeds." [Doc 64-3, p.5]; [Doc. 57-4, p.4]

In this regard, Morgan claimed that I had 12-16 "direct reports", which he claimed was too many. Id.  In truth, I had a total of 9  Direct Reports, in addition to the Principals of each school. Based on retirements, resignations, combinations of functions, and other changes  since Dr. Korengay replaced me the total number of direct reports has been modestly reduced, due solely to the combination of functions among my director level reports. [Doc. 80, pp. 72-78](Kornegay Dep. Pp. 71-77)

118.

The change being advocated by Morgan during my meetings with him in January and February of 2011 would not have substantially reduced the number of my "direct reports".  Instead, the "hatchet man" position was intended to be the first line of supervision—solely over the 6 school  principals within the school district, and it was not contemplated that I would have no role in their supervision. In fact, Mr. Morgan told me that I would still be responsible for "kicking their butts" as necessary.

119.

The fourth reason offered up by Mr. Morgan to justify my non-renewal was that TCSD encountered certain problems with the TEMS  (student information) software. [Doc 64-3, p.6]; [Doc. 57-4, p.4] When it became apparent to me that the problems with TEMS did not justify our continued use of it, I recommended that we utilize another system. All of this occurred long before my 2011 non-renewal, and was known

of by Mr. Morgan long before he sought to secure a contract extension on my behalf. At no time prior to my non-renewal did any member of the Board, including Mr. Morgan, indicate to me that the experience with the TEMS software was viewed as warranting my non-renewal.

120.

The fifth reason offered by Mr. Morgan as justification for my non-renewal   ("poor implementation of programs") [Doc. 64-3, p.6; Doc. 57-4, p.4] suffers from the same deficiencies. The events in question  occurred long before my 2011 non-renewal, and were  known  of by Mr. Morgan before he sought to secure a contract extension on my behalf. At no time prior to my non-renewal did any member of the Board, including Mr. Morgan, indicate to me that the experience with the TEMS software was viewed as warranting my non-renewal.

121.

While it is true that Mr. Morgan mentioned the name "Kathy Keown" during the 2/4/11 meeting as he states in his Declaration, [Doc. 57-4, p.5], he did not advocate her as candidate. [Exh. 7, p.83] Immediately before mentioning Ms. Keown's name, I asked Mr. Morgan the following question: "..who is it- I mean, is there someone that you're saying now that needs to be doing this?" Mr. Morgan's response

was, "Oh, no, no. I would never do that. I would never say a person because, as you say, I don't work with them day to day." [Exh. 7, p.82]

### C    Kay Streets

122.

In her responses to Interrogatories, Ms. Streets  offered up a number of purported reasons for opposing the renewal of my contract in February of 2011. [Doc 65, pp. 314-316] None of them withstand even the most minimal scrutiny.

123.

Ms. Streets's first stated reason for voting not to renew my contract was that I allegedly deceived her about the cost to TCSD  of the JROTC program, when were in the midst of a major budget crisis in 2008.  ("The information provide by Dr. Quiggg was false").  This assertion is utterly outlandish and devoid of any relationship to reality.

124.

Due to a need to reduce costs, I directed my staff to inquire as to the costs of certain programs to TCSD.   One such program was JROTC Program. Thomas McGawley was one of the JROTC instructors.   The School District, however, employed as second JROTC instructor,   Fannie Packer.

125.

On October 2, 2008, I was advised by email by Finance Director Joey Holland that the "Cost of McGawley salary and benefits is $90,000 per year." [Exhibit "8"] My understanding of the email was that $90,000 was the combined costs of compensation costs to TCSD for both Mr. McGawley and Ms. Packer, without inclusion of any sums for fringe benefits.

126.

Based in part on the data provided to me by Mr. Hollland, and based on my review of the number of students who participated in the JROTC program, all of which I communicated to the Board (including Ms. Streets),  I and my staff determined that JROTC was  program that could eliminated solely as a cost-cutting measure.

127.

At no time did I tell the Board or Ms. Streets that the cost to TCSD for the JROTC program was $90,000.  Quite to the contrary, the information provided to her accurately reflected that TCSD paid only 50% of the labor costs.

128.

Ms. Streets says in her Interrogatory Responses that "according to a

contract shown to [me] by the departing RTOC representative, the School District only paid $37,000 towards the cost of the program." No such contract was ever provided by Ms. Streets to back up her accusation.

129.

According to documents subsequently provided in this litigation [Exhibit "9" hereto], the compensation cost to TCSD for Mr. McGawley (for the contract period 7/1/08 to 6/30/09) was $5,605 per month for 12 months, for a total of $67,268. The compensation cost to TCSD for Ms. Packer was(for the contract period of 7/29/08 to 5/26/09) was $3,580 per month for 10 months, for a total, $35,800, and a combined total of $103,068. When I was accused of "lying" by Ms. Streets, these facts were repeatedly explained to her, and under the circumstances, she could not have reasonably believed that I lied about the JROTC costs.

130.

In early 2011, more than 18 months after the claimed JROTC fiasco, Ms. Streets agreed to renew my contract for a period of one year. [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24); [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she could not have relied on the JROTC matter to "change her mind" after that time.

131.

At no time was I ever disciplined formally or informally regarding this "matter",
nor was I ever informed or warned by the Board that my performance was deficient
regarding the JROTC matter, and at no time was I ever advised that my employment
was jeopardized as a result of that incident.

132.

Ms. Streets lists another "incident" that she claims to have relied on in
deciding not to renew my employment, which she describes as follows: "Dr Quigg
called a meeting of principals and told them a dramatic story of receiving threatening
letters." Ms. Streets does not bother to even identify when this supposedly happened,
or who was supposedly present.  [Doc 65, pp. 314-316]

133.

No member of the Board of Education was present when the meeting occurred,
and there is no evidence whatever that my actions in this matter were an attempt to
fabricate a means to intimidate anyone into doing (or not doing) anything. [Doc 61, pp.
22-23] (Heirs Dep. Pp. 21-22]

134.

As it turns out, on one occasion, I did receive a piece of mail that contained a
highly disturbing object inside. I mentioned that fact during a meeting.  End of story.

Both Scott Morgan and Nancy Hiers testified that this event was of no significance. [Doc 61 p.34](Hiers dep. P. 33); [Doc 64-2, p. 31]  (Morgan Dep. P. 148)

135.

At no time was I ever disciplined formally or informally regarding this "matter", nor was I ever informed or warned by the Board that my performance was deficient regarding this  matter, and at no time was I ever advised that my employment was jeopardized as a result of that incident.

136.

Though she cannot recall the source of her information [Doc. 65, p.92]  (Streets Dep. P. 90)  Ms. Streets next alleges in her interrogatory responses that I "made disparaging remarks about [her] being uneducated, rude  and unprofessional." I specifically deny that I ever stated that Ms. Streets was "uneducated".  [Doc 65, pp. 314-316] , although she admits that I "was always nice to her face."  [Doc 66, p.91] (Streets Dep. P. 89)

137.

I acknowledge that I  likely  did  comment  that Ms. Streets  was "rude"  and "unprofessional" in her dealings with me, because those were true statements of fact, as specifically recognized by Mr.  Morgan and Mr. NeSmith in their meetings with me in January-February of 2011 [Exhibits "2"-"7"]  During Board meetings, Ms. Streets

-46-

treated me with utter, visible contempt---not paying attention during my presentations, rolling her eyes, sighing, and endlessly "texting" on her cell phone, as confirmed by Principal Joe Sharp, during his deposition. [Doc 62, pp. 172-174] (Sharp Deposition, p. 171-173) Additionally , on one occasion, Mark NeSmith actually approached me in private to apologize for Ms. Streets's rude and unprofessional conduct and demeanor towards me.

138.

I could not understand or  explain Ms. Streets's conduct on other grounds other than that she is constitutionally unable to abide by a strong, professional woman in a role of authority.

139.

Although Ms. Streets does not bother to state in her Interrogatory responses when, or to whom, I said she was rude, disrespectful or uneducated, in early 2011 (presumably after she claims I was accused her of being uneducated, rude and unprofessional),   Ms. Streets agreed to renew my contract for a period of one year. [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she could not have relied on any belief that I had referred to her as  the "rude"-"uneducated"-"unprofessional"   to "change her mind" after that time and vote *against* a contract extension.

140.

At no time was I ever disciplined formally or informally regarding this alleged "matter", nor was I ever informed or warned by the Board that my performance was deficient regarding my behavior towards Ms. Streets, and at no time was I ever advised that my employment was jeopardized as a result of my behavior towards Ms. Streets.

141.

Ms. Streets next says in her Interrogatory responses that "I found Dr. Quigg to be very arrogant. It is my understanding that she believes that "uneducated persons" such as myself have no right to question her decisions or tell her how to run a school system." [Doc 65, pp. 314-316]

142.

Ms. Streets offers no recitation of objective facts or explanation as to *why* she felt that I was "very arrogant", or why it was her "understanding" that I believed that "uneducated persons such as [her] have no right to question her decisions or tell her how to run a school district." It is accordingly impossible for me to respond to such vague and utterly unsupported contentions, other than to say that at no time was I "very arrogant",   and at no time did I believe that "uneducated persons such as [her] have no right to question [my] decisions or tell [me] how to run a school district."

143.

Ms.  Streets agrees that: (1) "boards of education hire superintendents precisely because the members of the board of education are not qualified to run a school district".  [Doc 65, p.95]  (Streets Dep. P. 93), and (2) she (Streets) is not qualified to act as superintendent, and lacks any background or  training in  education. [Doc 65, pp. 94-95] (Streets Dep. Pp. 92-93). She further agrees that she cannot recall the names of any person who ever told her that I  believed that "uneducated persons such as [her] have no right to question her decisions or tell her how to run a school district."  [Doc 65, pp. 96-96](Streets Dep. Pp. 93-94)

### 144.

At no time was I ever disciplined formally or informally regarding my being "very arrogant",  nor was I ever informed or warned by the Board that my performance was deficient regarding my being "very arrogant", and at no time was I ever advised that my employment was jeopardized as a result of my allegedly being "very arrogant" to Ms. Streets.

### 145.

Although Ms. Streets does not bother to state in her Interrogatory responses when, how, or why she perceived that I was"very arrogant", in early 2011 (presumably after she claims I was very arrogant),   Ms. Streets agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p.

23](Morgan Dep. Pp. 140)This being the case, she could not have relied on any belief that I was "very arrogant" to "change her mind" after that time and vote *against* a contract extension.

146.

Mr. Streets next states in her Interrogatory responses that "Dr. Quigg actively worked against me and other Board members she did not like. For example, she found both Republican and Democratic candidates to run against me." [Doc 65, pp. 314-316] These contentions are utterly false, and Ms. Streets knows it.

147.

At no time did I "actively work against [her] and other Board members [I] did not like." To the contrary, at no time did I "actively work against [Streets] and other Board members", whether I liked them or not.

149.

Ms. Streets testified that these allegations were based purely on "rumor", and she could not identify a single person who "told her" these things about me, and that she had no evidence whatever to support these allegations—not a name, a date, or a place. [Doc 65, pp. 97-99 ] (Streets Dep. Pp. 95-96). Additionally, Nancy Hiers, who Ms. Quigg allegedly also campaigned against, said this was <u>not</u> a factor in her decision

-50-

to oppose the renewal of my contract. [Doc 61, p.11](Hiers Dep. P. 10)("It didn't bother me a bit").

150.

On deposition, Ms. Streets acknowledged that she had no evidence to support this allegation, but argued that "I haven't seeked any, but if I wanted to, I feel like I could." [Doc 65, p.100] (Streets Dep. P. 98)

151.

At no time was I ever disciplined formally or informally for my allegedly supporting Ms. Streets's (or other Board members' political rivals);  nor was I ever informed or warned by the Board that my performance was deficient regarding my allegedly having done so,  and at no time was I ever advised that my employment was jeopardized as a result of my allegedly supporting Ms. Streets's political rivals (or those of other Board members).

152.

Ms. Streets next states that she voted not to renew my contract because I "had serious ethical issues. She changed the grading system at the high school in order to improve her daughter's GPA. She would not allow school counselors to look at student grades, presumably to make it harder to discover Dr. Quigg's grade changes."   [Doc 65, pp. 314-316]

153.

On deposition, Ms. Streets could not offer a coherent or cogent explanation, nor offer any evidence whatever supporting her baseless allegation that I changed the grading system in order to benefit my children or that I would not allow school counselors to look at student grades so as to make it harder for counselors to disocver [my] grade changes.  [Doc 65, pp. 102-109](Streets Dep. Pp. 100-107]

154.

Moreover, as Mr. Morgan testified, the "issue" of my having changed grading policies never arose until after I was replaced by Dr. Kornegay. [Doc 64-1, pp. 32, 37](Morgan Dep. Pp.  90, 95).

155.

Although Ms. Streets does not bother to state in her Interrogatory responses when or why she believed that I had done these horrible things,  in early 2011, long after Streets claims that she first had concerns about the issue,  she agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24); [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she could not have relied on any belief that I changed grading policies in order  to "change her mind" after that time and vote *against* a contract extension.

156.

At no time was I ever disciplined formally or informally for my allegedly changing the grading system to benefit my child,   nor was I ever informed or warned by the Board that my performance was deficient regarding my allegedly having done so,   and at no time was I ever advised that my employment was jeopardized due to my having done so.

157.

Ms. Streets's next "justification" for voting not to renew my contract was that "I did not see any improvement in Dr. Quigg's tenure as superintendent." [Doc 65, pp. 314-316]

158.

At no time was I ever disciplined formally or informally for my allegedly not having "improved" during my tenure as Superintendent,   nor was I ever informed or warned by the Board that my performance was deficient regarding my allegedly having failed "to improve",    and at no time was I ever advised that my employment was jeopardized for this reason.

159.

In early 2011, long after Streets claims that I had "failed to improve",  she agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan

Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she

could not have relied on any belief that I "had not improved" in order to "change her

mind" after that time and vote *against* a contract extension.

160.

Ms. Streets' s next justification for voting not to renew my contract

was that "I did not see any effort by Dr. Quigg to meet the expectations set forth in

Scott Morgan's November 2009 letter of Understanding." [Doc 65, pp. 314-316] This

assertion is simply false. The "letter of understanding is contained in the record. [Doc

67-2, pp. 19-21] Immediately upon receiving it, I explicitly addressed all of the items

contained therein, and continued to do so all throughout the next year. Improvement

and changes were implemented throughout the year. Ms. Streets does not say which

of the items in the letter, in her judgment, were or were not addressed, so it is

impossible for me to respond more specifically. In light of the 2010 Performance

evaluation scores I received from the Board collectively and individually, Ms. Street's

allegations regarding the 2009 letter of understanding are wholly unworthy of credence.

161.

At no time was I ever disciplined formally or informally for my allegedly not

attempting to meet the expectations set forth in Scott Morgan's 2009 letter of

Understanding. Nor was I ever informed or warned by the Board that my performance

-54-

was deficient regarding my allegedly having failed "to meet the expectations set forth in Scott Morgan's November 2009 letter of Understanding,  and at no time was I ever advised that my employment was jeopardized for this reason.

162.

Defendant Streets's Declaration [Doc. 57-6, pp. 2-7] sets forth the  same supposed "reasons" why she voted not to renew my contract as those set forth in her interrogatory responses, and for the same reasons set forth above, are utterly unworthy of credence.

**D    Nancy Hiers**

163.

In Interrogatories, Defendant Hiers was asked to state each and every reason she voted not to renew Dr. Quigg's contract. [Doc 61, pp. 158-59]. Her first "reason" was that "The moral among our staff was pathetic.  Trista Jones told me that many of our teachers were unhappy and had decided not to renew contracts rather than to continue working under Dr. Quigg's leadership." However, on deposition, Ms. Hiers stated that Ms. Jones's comments were "simply in passing." [Doc 61, p.36]  (Hiers Dep. P. 35). Hiers added that "I didn't ask for specifics and she didn't give any." Id Additionally, contrary to Ms. Hiers's assertion regarding "morale", I was in a far better position to assess "morale", being in the schools daily whereas Ms. Hiers was only infrequently

in the schools. By no stretch of the imagination, was morale "pathetic"; to contrary, though there occasionally disgruntled employees who attempted to vent their displeasure to individual members of the Board, the vast majority of personnel were satisfied with their work environment and they way there were treated.  Ms. Hiers simply was not in a position to make an informed judgment to the contrary,

164.

At no time was I ever disciplined formally or informally due to any alleged "poor morale"  nor was I ever informed or warned by the Board that my performance was deficient regarding allegedly "poor morale"   and at no time was I ever advised that my employment was jeopardized for this reason.

165.

In early 2011, long after Hiers  claims that there was "poor morale",    she agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she could not have relied on any "poor morale" belief   in order   to "change her mind" after that time and vote *against* a contract extension.

166.

Ms. Hiers next stated reason for voting not to renew my contract was that I "divided the system. Employees were either on the Quigg team, or on the outside.

Dissenting voices were often punished or reprimanded." [Doc 61, p.158] When asked to explain and give examples, however, Ms. Hiers stated only that it was her view that a single teacher----Jeanna Mayhall, was "on the team" and that Ken Harper and Trista Jones were "not on the team". [Doc 61, pp. 54-55](Hiers Dep. Pp. 53-54) When asked to name a single employee who felt "punished" or "reprimanded", Ms. Hiers was unable to name a single one. [Doc 61, pp. 57-58]   (Hiers Dep. Pp. 56-57)Later, Hiers admitted that she had "no evidence" to support any such outlandish contention. Id

167.

At no time was I ever disciplined formally or informally due to any alleged "dividing the system",  nor was I ever informed or warned by the Board that my performance was deficient regarding allegedly "dividing the system"   and at no time was I ever advised that my employment was jeopardized for this reason.

168.

In early 2011, long after Hiers  claims that I was "dividing the system", she agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she could not have relied on any "dividing the system" belief   in order   to "change her mind" after that time and vote *against* a contract extension.

169.

Ms. Hiers next stated that "I was very troubled to learn that Dr. Quigg had arranged to have her daughter's grades at Thomasville University deleted from her high school transcript...." [Doc 61, p.158] On deposition, however, Hiers admitted that she had no evidence to back up that contention. First, she admits that she never saw any documents to this effect. [Doc 61 pp. 28-29](Hiers Dep. P. 27-28)("I didn't see anything because I didn't ask for anything, and I didn't want anything"). Further, although Ms. Hiers initially stated that Ken Harper had made this allegations, she later recanted and testified that Harper had not in fact made the allegation to her.  [Doc 61, pp. 30-33](Hiers Dep. Pp. 29-32], but that some other person whom she could not identify had made the allegation. Ultimately, Hiers testified that she made the allegation in her interrogatory response because when she heard the accusation from persons unknown, "It didn't surprise me, that's why I put it in here." Id In the end, Hiers admitted that she had absolutely no evidence to support this accusation. Id

170.

At no time was I ever disciplined formally or informally due to any alleged "grade changing"  nor was I ever informed or warned by the Board that my performance was deficient regarding alleged "grade changing",   and at no time was I ever advised that my employment was jeopardized for this reason.

171.

In early 2011, long after Hiers claims that I "changed grades",  she agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);  [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, she could not have relied on any "grade changing" belief  in order  to "change her mind" after that time and vote *against* a contract extension.

### 172.

Despite listing several supposed performance-related "justifications" for voting not to renew my contract, Defendant Hiers, in fact, always judged my work performance to be satisfactory. In this regard, Hiers testified as follows: "I thought and I still–you know—thought  Dr. Quigg did an OK job." [Doc 59, pp. 59-60](Hiers Dep. Pp. 58-59]

### 173.

After my non-renewal, my Administrative Assistant, Carol Gerald, asked Ms. Hiers why she voted not to renew my contract. As recounted by Ms. Gerald,

> Ms. Hiers basically told me that it was because of Dr. Quigg's decision not to change anything, immediately adding that *"I thought Dr. Quigg needed a strong male to work under her to handle problems, someone who could get tough with these people that are causing problems.*

[Exhibit "10"]

### E    Charles Evans

174.

In his responses to Interrogatories, Mr. Evans offered a number of reasons as to why he voted not to renew my contract. [Doc 60, pp 205-206]  Each of those reasons are either demonstrably false, or are on their face are so patently preposterous that are unworthy of credence.

175.

Mr. Evans's first reason, "Dr Quigg would tell me a lie", is itself a deliberate falsehood.  In this regard, Mr. Evans  states, "Dr. Quigg denied that any of the parapro's got supplements." Id.  When Mr. Evans asked about the supplements, I overlooked the fact that a small number of Parapros who dealt with special needs children, changing diapers of multiply handicapped students  and the like, did receive a supplement, and indicated my belief that Parapros generally did not receive supplements.  However, I immediately checked on the matter, and promptly advised Ms. Evans that there were a few Parapros who did receive supplements.  On these facts,   Mr. Evans could not have rationally believed that I "lied to him".

176.

On deposition, however, Mr. Evans stated that he had "caught me in three lies." [Doc 60, pp. 38-39] (Evans Dep. Pp. 36-37) Incredibly, however, Mr.  Evans testified that he could not remember what the alleged "lies" were.  Id, and further, that

the alleged (but denied) "lies" were "insignificant." [Doc. 60, pp. 41-42]   (Hughes

Dep. Pp. 39-40)

### 178.

At no time was I ever disciplined formally or informally due to any alleged "lies"

nor was I ever informed or warned by the Board that my performance was deficient

regarding alleged "lying",     and at no time was I ever advised that my employment

was jeopardized for this reason.

### 179.

In early 2011, long after Mr. Evans  claims that I "lied",  he  agreed to renew

my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);

 [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, he could not have relied

on any "lying" belief   in order   to "change his  mind" after that time and vote

*against* a contract extension.

### 180.

During his deposition (but not in his Interrogatory responses),  Mr Evans

stated that he perceived me as a "bully." But, he never included that accusation among

the reasons he listed in his interrogatory responses.  [Doc 60, pp 205-206], and he

further admitted that: (1) he could not recall the name of a single employee who made

that accusation; and (2) the accusation was never addressed by the Board of Education.

[Doc 60, pp. 52-54](Evans Dep. pp. 50-52]

181.

Mr. Evans next stated that he "did not like the fact that Dr. Quigg "Riffed"

the youngest teachers and kept teachers that were not certified."   [Doc 60, pp 205-

206] In truth, I did not RIF anyone. As concerns personnel matters, as superintendent,

I was  only empowered to make recommendations to the Board of Educations. All

"RIF" recommendations I made  were approved by the Board.  Moreover, state law

specifies precisely the criteria that must be observed in making "rif" decisions.

O.C.G.A. §20-2-948. ("The local board shall consider as the primary factor the

performance of the educator, one measure of which may be student academic

performance").   This criterion was strictly observed in any and all RIF

recommendations I made to the Board, which recommendations were approved by the

full Board, irrespective Mr. Evans's views that it would be preferable to retain younger

workers. But, as Mr. Evans admitted on deposition, he did not know that there were

state laws governing the subject. [Doc 60, p.73 ](Evans Dep. P. 71)

182.

At no time was I ever disciplined formally or informally due to any of my

RIF recommendations,  nor was I ever informed or warned by the Board that my performance was deficient regarding my RIF recommendations,    and at no time was I ever advised that my employment was jeopardized for this reason.

183.

In early 2011, long after Mr. Evans    claims that I made the RIF recommendations,  he  agreed to renew my contract for a period of one year. [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);    [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, he could not have relied on my RIF recommendations  in order  to "change his  mind" after that time and vote *against* a contract extension.

184.

Mr. Evans next stated that "I did not like the fact that 5th grade teachers no longer had their regular duty-free lunch after 5th grade was moved to the Middle School."   The elimination of the "duty free lunch", however, was not a decision I made. Instead, the Board approved a decision to transfer the 5th grade from the Elementary School to the Middle School. The policy and practice at the Middle School did not include a "duty free lunch." Indeed, a waiver for the 5th Grade Teachers not having duty-free lunch was received from the Georgia Department of Education after the TCSD Board approved it, at the unanimous desire of the Fifth Grade teachers in

order for them to have a longer collaborative planning period to meet together with parents to increase student achievement efforts.

185.

At no time was I ever disciplined formally or informally due to the "duty free lunch" issue,  nor was I ever informed or warned by the Board that my performance was deficient regarding this issue,     and at no time was I ever advised that my employment was jeopardized for this reason.

186.

In early 2011, long after the 5th grade was transferred to the Middle School, Mr. Evans   agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, he could not have relied on the "duty free lunch issue"   in order   to "change his mind" after that time and vote *against* a contract extension.

187.

Mr. Evans's next complaint was that I "always had last minute changes to the agendas so that she could try to 'slip something' past the board. "  [Doc 60, pp 205-206] This is simply not truthful. Certainly, there was occasions when Board agendas had to be modified or changed. Frequently, Board members themselves requested the addition, deletion, or modification of agenda items. At no time did I ever attempt to

"slip something past the board', and Mr. Evans offers no facts, circumstances or evidence of any description to suggest otherwise.  Indeed, Mr. Evans admits that he has no such evidence. [Doc 60 p.99 ](Evans Dep. P. 97)

188.

At no time was I ever disciplined formally or informally due to the "agenda" issue,  nor was I ever informed or warned by the Board that my performance was deficient regarding this issue,     and at no time was I ever advised that my employment was jeopardized for this reason.

189.

In early 2011, well after    Mr. Evans claims that the "agenda" issue arose, he  agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, he could not have relied on the "agenda"   in order  to "change his  mind" after that time and vote *against* a contract extension.

190.

Mr. Evans next alleged as a reason for my non-renewal  that I "improperly used school resources and/or [my] staff to get me voted out of office."This is simply untrue, as I never engaged in these activities. And, Mr. Evans admitted on deposition that he has no evidence to support this contention, and that he cannot identify a single person

who provided this information to him. [Doc 60, p.101-102 ](Evans Dep. P. 99-100)

In the end, Mr. Evans admitted that all he had was rank speculation regarding any

political activities on my part, but that he nonetheless relied on such rank speculation

in voting not to renew my contract. [Doc. 60, p. 105 ](Evans Dep. P. 103]

and Mr. Evans admitted on deposition that he has no evidence to support it.

191.

Mr. Evans also stated that one of his reasons for opposing my renewal was that

"Joe Sharp put an announcement for my opponents in a 2010 football program."  "

[Doc 60, pp 205-206] I did not authorize the advertisement, which  Mr. Evans would

have known if he had chosen to  approach  me about , which he did not. Moreover, the

matter was apparently so insignificant to Mr. Evans that he  never took the trouble to

bring the matter to the attention of the entire Board  investigate whether there were any

rules or regulations violated regarding the advertisement. [Doc 60, p. 109 ] (Evans

Dep. P.107 )

192.

Mr. Evans also stated that one of his reasons for opposing my renewal was that

"I was told that Dr. Quigg held a prayer vigil in her office on the night of the election

to pray that Kay Streets, Nancy Hiers and I be defeated." [Doc 60, pp 205-206] Once

again, these allegations are incorrect. I did not "hold" a prayer vigil for anyone. One

of the candidates for office requested permission to use a conference room for an election night event, which my Administrative Assistant authorized. Thereafter, I did briefly attend to pay my respects.  Mr. Evans acknowledges that he was told by "person a" that "person b" told "person a", that there had been a "prayer vigil. [Doc 60, p.110 ](Evans Dep. P.108) Mr. Evans's reaction at the time was to do absolutely nothing. Id

193.

At no time was I ever disciplined formally or informally due to the "Politics" issue,  nor was I ever informed or warned by the Board that my performance was deficient regarding this issue,     and at no time was I ever advised that my employment was jeopardized for this reason.

194.

In early 2011, after     Mr. Evans claims that the "politics" issue arose, he agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, he could not have relied on the "politics"   in order  to "change his mind" after that time and vote *against* a contract extension.

195.

Rather than actually relying on  the pretextual justifications for voting not to renew my contract recited  in his Interrogatory responses,  Mr. Evans stated during his

deposition that *"I voted against her because I didn't like her."* [Doc 60 p.111](Evans Dep. P. 109). In this regard, he further testified that I was "arrogant" [Doc 60, p. 78-79] (Evans Dep. P. 76-77) and "bossy", Id, in other words, a "bossy" *woman.*

197.

In his Declaration [Doc 57-2]  Mr. Evans identifies primarily the same factors upon which he relied in voting not to renew my contract as those specified in his Interrogatory Responses. However, in his Declaration he added another purported "lie" on my part. This time, the "lie" pertained to a former employee, Torrance Choates. [Doc. 57-2, p.2] In this regards, Torrance Choates applied for a position with TCSD, and I made a decision to recommend to the Board that Mr. Choates be hired. At the same time, staff was compiling the staff directory for publication, and my recommendation had not yet been approved by the Board. However, a tentative draft of the directory had been prepared (but not submitted for publication) in which Mr. Choates's name had been penciled in. When Mr. Evans approached me about the matter, and after a conversation with the high school principal,  I told him that, yes, Mr. Choates's name had been tentatively penciled in to the draft directory, but that it had not been submitted for publication, and would not be so submitted unless and until all of the persons listed in the directory had been approved by the Board.  Mr. Evans

therefore knew then, and has always known, that I never "lied" about the Choates matter.

198.

At no time was I ever disciplined formally or informally due to the "Choates" issue,  nor was I ever informed or warned by the Board that my performance was deficient regarding this issue,   and at no time was I ever advised that my employment was jeopardized for this reason.

199.

In early 2011, after    Mr. Evans claims that the "Choates" issue arose, he agreed to renew my contract for a period of one year.  [Doc 64, pp. 24-25] (Morgan Dep. Pp. 23-24);   [Doc 64-2, p. 23](Morgan Dep. Pp. 140)This being the case, he could not have relied on the "Choates" issue    in order   to "change his  mind" after that time and vote *against* a contract extension.

200.

In his Declaration, Mr. Evans also craftily added other "reasons" for voting not to renew my contract which were not included in his Interrogatory responses. For example, he states in his Declaration that I was "a bully who tried to intimidate people including myself. I felt that Dr. Quigg considered me to be a 'dumb game warden' and 'and uneducated boob."  Insofar as the "bully" allegation is concerned,  Mr Evans

admitted that: (1) he could not recall the name of a single employee who made that accusation; and (2) the accusation was never addressed by the Board of Education. [Doc 60, pp. 52-54](Evans Dep. pp. 50-52) Further, the only example that Mr. Evans ever gave of "bullying" or "intimidating" the Board was contained in an e-mail he sent to Scott Morgan on January 27, 2011:

> ...Jean has led the district with threats and intimidation for the last three years and whenever she wants her way such as "the graduation exercise" and now "her contract" she has called in her entourage to intimidate the board, ***now we are in the process of hiring an ax man*** to carry on for her. Just yesterday, she was flooded with at least 13 flower arrangements to celebrate her victory over us uneducated board members.

[Doc 60, p. 226] Additionally, since Mr. Evans has given no examples or explanations as to why he claims to believe that I felt he was a "dumb game warden" or an "uneducated boob", and has offered not a whit of evidence to substantiate any such belief, it is impossible to respond to such purely subjective accusations.

## VIII      No Offer-No Rejection Of One Year Contract Extension

201.

In TCSD's "position statement" (authored by Attorney Randall Farmer)  submitted to the EEOC, it implies that I was non-renewed because I was offered but did not accept a one-year contract extension.   [Doc 80-23, p. 4]

202.

At no time prior to my non-renewal was I ever offered a one-year contract extension, although I did express my hope that I would receive a two-year contract extension. Mr. Morgan agreed on deposition that no formal offer was ever extended or refused by me. [Doc 64-2, pp. 159; 166]

## IX   Differential Treatment

203.

I am a female citizen. Based on my training, education and experience, at the time of my non-renewal, I was qualified to hold the position of Superintendent. I was non-renewed from that position, and was replaced by a male, Dusty Korngegay.

### A   *Personnel Micro-Management*

204.

My experience with the Board of Education in 2009 and 2010 was that the Board constantly micro-managed my personnel decisions and recommendations. In this regard, members of the Board frequently challenged my recommended assignments and selections. The most recent example was Mr. Morgan's and Mr. NeSmith's reactions to my recommendations to appoint Tonya Johnson and Jeneane Weir to the curriculum officer positions. In his Declaration, Mr. Morgan suggested that neither one of them was qualified for the position. [Doc 57-4, p.5] Mr. NeSmith's Declaration

suffers also evidences such micro-management of my personnel decisions, stating that his view, my selections were not qualified. [Doc 57-5, pp. 3-4]

205.

More specifically, the Board engaged in the following practices:

-Did not allow me to appoint staff to positions or transfer staff to positions as needed for the good of the students without posting all positions, emailing all current staff of openings, and interviewing for all positions.

-Interfered with personnel issues by giving me a directive to write a letter of reprimand to a principal, Jeanna Mayhall, which was outside the purview of the board and was outside the normal staff disciplinary procedures. I had already handled the personnel issue, but the defendants interjected themselves into it.

-Went outside their realm of responsibilities by recommending candidates for hire. Scott Morgan and Mark Nesmith told me that the next administrator would be from within the system. Morgan asked me did I not have a male for the assistant superintendent position when I discussed the two females that I recommended for the two directors of curriculum (assistant superintendent/second in charge) positions. They also told me that I could not post the assistant superintendent / second in charge position for outside candidates after I told them that I could post the position when

-72-

they did not agree with the female recommendations.  Mark Nesmith suggested Lee Bailey, a male assistant principal for consideration.

-Insisted that I  cut system and some school personnel contracts to 11 or 11 ½ months from 12 months and my  successor has been able to add the days back to contracts.

-Insisted that I cut system office staff and my  male successor has been allowed to add system office staff. The five defendants constantly told me that there were too many people at the county office and that I  did not need all that staff so I  was told she needed to cut back.

-Was required  to personally interview candidates for an assistant principal's position at the high school after Joe Sharp, the principal,  had already interviewed and made his recommendation, with which I  agreed because I  had reviewed his record and discussed the candidate in detail with Mr. Sharp. The recommended candidate was an African –American man, Torrance Choates. After personally interviewing the top candidates and not changing the recommendation, it took me  several board meetings to get the approval of the African American candidate. A few weeks after the approval, an investigation was done by the sheriff's department on this assistant principal.  I was told by Scott Morgan that Catherine Smith, the D.A.,  had done the investigation. This investigation was not requested nor approved by me  because it was beyond the normal

criminal background check done on all potential employees. Later, Scott Morgan

admitted to me that Catherine Smith had not done the investigation and implied that

Kay Streets had had her father, the sheriff, do the investigation. A criminal background

check, as done on all potential employees, had been done by the HR director prior to

my recommendation of him to the board. Morgan had lied to me, and Streets had gone

beyond her realm of responsibility to engage in personnel issues that were racially

discriminatory and violated the civil rights of the African American man.

206.

In contrast to the Board's micro-management of my personnel decisions and

recommendations, the Board has never sought to control such decisions on the part of

my male successor, Dr. Kornegay. In this regard, Dr. Kornegay testified that the Board

never told him who to appoint or who not to appoint.  [Doc 80, p.67] (Kornegay Dep.

P. 66] Defendant Evans's testimony is to the same effect. [Doc 60, p.36](Evans Dep.

P. 34)

**B**     **Other Examples**

207.

During the course of this litigation, I provided responses to

Interrogatories propounded by the individual defendants in this case, which asked to

me identify all facts, circumstances and events which supported my contention that I

was non-renewed based on my gender or in retaliation for refusing to engage in gender based employment decision. A true and accurate copy of my responses are attached hereto as [Exhibit "11"] I previously verified the contents of those responses under Oath, and do so again now.

208.

I specifically incorporate by this reference the substance of all of my interrogatory responses. [Exhibit "11"]

## X   POST NON-RENEWAL EVENTS

### A   Morgan's Explanation

209.

Subsequent to the non-renewal vote, I asked Scott Morgan why he voted against my contract extension. His response was "Frankly, I didn't like your plan."

210.

The "plan" referenced by Mr. Morgan was my recommendation to reorganize the system by appointing two female curriculum officers rather than appointing a male hatchet-man as demanded by Mr. Morgan and Mr. NeSmith on behalf of the Board.

### B   Filing Of EEOC Charges

211.

After I was non-renewed, I learned on or about June 20, 2011, that the Board

had selected Dusty Kornegay (male) as my replacement.

212.

Thereafter, with sufficient evidence to make out a "prima facie case" of gender discrimination, I filed an EEOC charge of gender discrimination/retaliation on August 3,2011. [Doc 67-2]. Prior to that time, insofar as my present claim that I was not renewed due to my gender, I suspected, but did not have sufficient evidence to assert such a claim.

### C    Retaliatory Filing Of Meritless PSC Complaint

213.

According to Dusty Kornegay,  TCSD received notice of my charge of discrimination-retaliation  on or about August 22, 2011. [Doc 80, p.160] (Kornegay Dep. p. 159], although the document itself is dated August 17, 2011. [Doc 80-17]

214.

After Mr. Kornegay took office, Scott Morgan directed Mr. Kornegay to "look into" allegations that I had engaged in misconduct while in office, specifically, that I changed grading systems in order to benefit my daughter, and that after I left employment with TCSD, that I conspired to alter grade records. [Doc 64-1, p.34](Morgan Dep. P. 92); [Doc 64-2, pp. 57-58](Morgan Dep. Pp. 115-116]

215.

In terms of timing of the receipt of notice of my EEOC charge, and the institution

of the "Kornegay investigation", Kornegay has stated that "During my first few months

in office, I have learned about several practices within the district office which I

consider to be 'irregular.'" [Doc 80-18] (2/6/2012 Email from Kornegay to PSC

Investigator John Grant)

216.

As it turns out, even before his 2/6/2011 e-mail to Mr. Grant, Kornegay had

apparently already decided to file a complaint with the PSC. Specifically, on or about

February 2, 2012, Dr. Kornegay prepared a letter directed to Mr. Kelly Henson of the

Georgia Professional Standards Commissioner. [Exhibit "12" hereto] The letter

included the following statements:

> During the first few months of my administration, I have
> discovered several practices within the district office which
> I consider to be inconsistent with State Board of Education
> Rules...This letter is not intended to state any opinion on my
> part as to whether these previous practices or acts violate the
> Georgia Educator Code of Ethics....

217.

On September 16, 2011, TCSD submitted its position statement to the

EEOC regarding my EEOC charge. The position statement was authored by attorney

Randall Farmer. [Doc 80-23] Notably, the "position statement", in setting out TCSD's

claimed "legitimate non-discriminatory reasons", it does not set out any of the allegations of lying, deception, subterfuge, and cheating that it now hurls at me in the context of this litigation. See, Doc 80-23, p.4. It likewise fails to include any assertion that I was not-renewed, as Ms. Streets and Mr. Evans would have it, at least in part because I supposedly supported their political rivals.

218.

At some point while preparing the position statement (i.e, between August 22, 2011 and September 16, 2011), Mr. Farmer "as a part of the discovery process in preparation to defend the school district",  discovered that prior to leaving office,  I "directed the system technology director to back-up all of the files on [my] computer to flash drives and then to delete the computer hard drive." [Exhibit "13" hereto] (3/7/2012 letter to PSC, signed by Dusty Kornegay). Therein, Kornegay explained that:

> Quigg subsequently filed an EEOC complaint against the school district. As part of the discovery process in preparation to defend the school district issued a demand letter to Quigg requiring the return of the electronic files. Quigg complied.

Id at p.6.

219.

Mr. Grant responded to Dr. Korengay's 2/6/2011 e-mail the next day, stating that, "I received your email. Give me a call when you get back to your office and we will set up a time for the consultation." [Doc 80-18]

220.

Grant visited the TCSD offices February 22-24, 2012. [Doc 80-15, p.1], during which time Grant met with Kornegay, Morgan, and others.

221.

On March 6, 2012, Kornegay sent an email to Grant stating, "Attached you will find a draft report to PSC that I have prepared." [Doc 80-21]. The letter is Exhibit "13" hereto.

222.

On March 7, 2012, Grant emailed back to Kornegay, stating "I have your *complaint* and will get back to you ASAP." [Doc 80-21]

223.

On March 8, 2012, Grant again emailed Kornegay, stating that "I have printed your letter and will read it in the morning." [Doc 80-19]

224.

On March 9, 2012, Grant once again emailed Kornegay, suggesting that Kornegay made certain changes/additions to the complaint. [Doc 80-22]

225.

On March 12, 2012, Kornegay emailed Grant, stating, "I have revised the letter to include the information you suggested*. I have asked our board attorney to review it before I submit the official copy*...As soon as I receive feedback from out attorney, I will submit the revised official copy." [Doc 80-20]

226.

Grant  emailed Kornegay back on March 12, stating, "Okay. I will not  start anything. I do not want to get these educators assigned case numbers *and your attorney advise you not to send the complaint."*  [Doc 80-20]

227.

On March 18, 2012, Kornegay wrote back to Grant stating that "attached is the PSC report document *which reflects the revisions recommended by our school board attorney."*  [Exhibit "14" hereto]

228.

The "new and improved report", i.e., as edited by TCSD's lawyers,

dated 3/19/2012,  is included in the record at Doc 80-15.  Notably, it deletes the reference in the March 7 version  to the fact that Quigg had previously filed an EEOC charge.

229.

Incredibly, ***attorney Randall Farmer, the attorney representing TCSD in this lawsuit, was  one of the persons "who participated in the decision of the Thomas County School District to make an ethics complaint to the PSC regarding the Plaintiff."***  [Exhibit "15" hereto pp. 9-10]

230.

The allegations made to the PSC by TCSD and attorney Farmer are false, and are merely a pretext intending to hide their retaliatory animus.

231.

On April 17, 2012, I was advised by PSC that it was "investigating" TCSD's pretexual and retaliatory "ethics complaint" against me. I received a letter that day advising me that I was under investigation for: (1)  asking school personnel to alter my daughter's grade transcript; (2) altering the dual enrollment reporting policy in order to help my daughter; and (3) taking confidential information with me when I left my employment. [Exhibit "16" hereto"]

232.

On July 20, 2012, I was notified by PSC that based on the false and pretexual

allegations presented to it by TCSD,  it had found "probable cause" to believe that I

had committed an "ethics violation" with regards to Items "1" and "2" referenced in

the preceding paragraph. [Exhibit "17" hereto] PSC did <u>not</u> found "probable cause"

relative to Item "3" (taking confidential data).

233.

To date, there has been no adjudication of the false and pretextual charges level

against me by TCSD to the PSC.

234.

In regards to the allegation that I changed grade reporting ("dual enrollment"

policies to benefit my daughter, Kendall:

> I did not change the dual enrollment program to benefit my child, Kendall, or
> any other child. The Human Resources Director and the Curriculum Director
> always worked together to revise any board policies related to curriculum based
> on revisions sent to them from the Georgia School Boards Association or
> information received from the Department of Education. Any changes or
> revisions made at any time in a dual enrollment policy that was based on sample
> policies sent to the HR Director from GSBA or DOE would have been taken to
> the Board of Education, explained by these directors, and voted on by the Board
> of Education before being implemented.

> The high school was in charge of the implementation of dual enrollment
> programs. To my knowledge, the "Guidance for College Credit Now (Dual
> Enrollment)" from the Department of Education that was in place through 2010

was the guidance document used by the high school.

235.

In regards to the allegation that I conspired unlawfully alter my

daughter's grade on her transcripts,

> The practice of awarding a half (.50) credit for Personal Fitness to students who took Marching Band was in place before I became superintendent. Students were also being awarded Personal Fitness credit for Weight Lifting classes, and I just learned about this practice during these proceedings. This had also been in place before I became superintendent. After my non-renewal and before physically moving to Oconee County, we had to enroll our daughter, Courtney, at North Oconee High School. I had asked to get her transcript from Thomas County printed quickly when we were making an unexpected trip to Oconee County to get her enrolled. While enrolling her and talking with Mike Kulp, head counselor at NOHS in Oconee County, I told that him that one semester of Marching Band had counted at TCCHS for Personal Fitness. He asked if I could ask the school to reflect that on her transcript. As a **parent** who was aware that this had been the procedure in Thomas County for students for many years, I assumed that it not being reflected on her transcript was an oversight at the high school. I asked the principal to check on it. Since this had been the procedure for many years, the school changed her transcript to reflect .50 credit for Personal Fitness in the place of one semester of Marching Band (.50 credit) that she had taken. I did not "plot" to have her transcript "altered." I simply asked, **as a parent**, that my child be treated like all the other students at TCCHS for the past 5-6 years or more who had taken Marching Band and received the .50 Personal Fitness credit.

This false accusation was made after I filed an EEOC complaint against Thomas County. My daughter took Personal Fitness online through the GA DOE Virtual School while at North Oconee High School in Oconee County.

236.

Not content with having engaged in a calculated campaign of the retaliation, harassment, and intimidation against me outlined above, during the midst of this litigation, on July 25 2013, TCSD, though Dusty Kornegay,  elected to file a meritless bar complaint against my former attorney in this matter (Jerry Lumley) [Exhibit "18" hereto]

237.

Mr. Lumley is presently representing me in litigation pending in the Superior Court of Fulton County, wherein the issue is whether or not the PSC has complied with the statutes governing its "investigation" of TCSD's ethics complaint against me.  A true and accurate copy of the Complaint in that case is attached hereto as Exhibit "19".

238.

Attached hereto as Exhibit "20" is a listing of the candidates who competed to replace me as Superintendent. There are a total of 35 candidates, and they are divided into three categories, 1-3, with "1" being the best qualified. (Morgan Dep. P. 161). The

only persons considered by the TSCD screening Committee were persons who ranked "1". (Morgan Dep. p. 163).

239.

Of the seven persons who were ranked as Category "1", seven (7) were male, and zero (0) were women.

240.

Not a single woman was considered by the screening committee to be my successor.

241.

Attached hereto as Exhibit "21" is my manually signed signature page of this document.

242.

On penalty of perjury, I  hereby affirm that the foregoing is true and correct .

Executed this 28th day of March, 2014.


/s/ Linda Jean Quigg

Linda Jean Quigg