**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **LINDA JEAN QUIGG, Ed.D.,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:12-CV-153 (HL) |
| **THOMAS COUNTY SCHOOL DISTRICT, *et al.*,** | |
| Defendants. | |

## ORDER

Before the Court are Defendant Thomas County School District's Motion for Summary Judgment (Doc. 69) and the Motion for Summary Judgment (Doc. 57) filed by Defendants Charles Evans, Nancy Hiers, Scott Morgan, Mark NeSmith, and Kay Streets (collectively "Defendant Board Members").[1] For the reasons stated below, the motions are granted.

### I.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises

---

[1] As used in this Order, the term "Defendants" refers to the Thomas County School District and the Defendant Board Members.

only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the opposing party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

2

burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Furthermore, under Local Rule 56, the facts listed in the movant's statement of material facts will be deemed admitted as undisputed unless the non-movant denies each specific fact and provides a supporting citation to the factual record. M.D. Ga. L.R. 56.

## II.    Factual Background

This case arises from the vote by the Thomas County Board of Education ("Board of Education" or "the Board") on February 8, 2011 not to renew the contract of Plaintiff Linda Quigg ("Plaintiff") as the superintendent for the Thomas County School District ("County School District"). Thomas County, Georgia has two public school systems, the County School District and the Thomasville City School District ("City School District"). Generally speaking, children residing in Thomas County can attend either the county or city schools. (Defendant Board Members' Statement of Material Facts ("Members' SMF"), Doc. 58, ¶¶1, 12a).

### A.    Plaintiff's Tenure as Superintendent

After being hired by the Board of Education to a three-year contract, Plaintiff began working as superintendent on July 1, 2007. She had been working in the school district since August 1995, first as an assistant principal and later as an assistant superintendent of curriculum and instruction. Defendant Kay Streets ("Streets"), who of the Defendant Board Members was the only one on the Board

at the time, voted to hire Plaintiff as superintendent. On July 1, 2008, the Board of Education extended Plaintiff's contract by a year. Defendant Nancy Hiers ("Hiers"), Defendant Charles Evans ("Evans"), and Streets voted in favor of this extension. In November 2008, Defendants Mark NeSmith ("NeSmith") and Scott Morgan ("Morgan") were also elected to the Board of Education. In 2009 Plaintiff requested, but did not receive, an additional one-year extension. In Plaintiff's experience, a typical superintendent in Georgia only remains with a school district for three years. (Id. at ¶8; Thomas County School District's Statement of Material Facts ("District's SMF"), Doc. 70, ¶¶30-40, 45; Plaintiff's Declaration, Doc. 85, ¶¶34, 36).

During the 2008–2009 school year, Kay Streets, who was then chairman of the Board of Education, gave Plaintiff a Letter of Understanding. The letter's purpose was to improve Plaintiff's relationship with the Board. The letter set forth a number of performance goals for Plaintiff, including the following: increasing graduation rates, increasing test scores, selecting programs to implement, developing a communication plan, creating transparency and accountability throughout the school system, ensuring board meetings focused on school operations, and establishing procedures for superintendent/board working relationships. Plaintiff did not see anything inappropriate in the Letter of

Understanding, and she did not write a rebuttal to it or discuss it with board members. (District's SMF, ¶¶101, 103-07).

During Plaintiff's tenure as superintendent, the Thomas County School District grappled with a number of changes. Some parents and teachers struggled to understand and adapt to the new standards-based report card that had been introduced under Plaintiff's predecessor, and the school district eventually returned to the traditional grading system. A student management system, known as "TEMS," that had been implemented during Plaintiff's tenure was eventually abandoned because of technical deficiencies. Plaintiff also decided to end the school district's Air Force Junior ROTC program because she believed that the small number of students who participated in the program did not justify its costs. (Members' SMF, ¶¶8f, 18y-z; District's SMF, ¶136; Deposition of Plaintiff, Doc. 67-68, pp. 153-55, 163). While Plaintiff was superintendent, the County School District lost 544 students and $3,000,041 in state funds relating to those full-time equivalent ("FTE") students, while the City School District gained 210 students and $1,169,695 in funding during that same time. (Members' SMF, ¶3).

While Plaintiff was superintendent, the county school system also structured courses in a way that implicated student transcripts and FTE funding. Under a dual enrollment program, high school students in the county district were

allowed to take courses at local colleges with the classes counting toward the students' FTE status for funding purposes. In the 2009-2010 school year, one of Plaintiff's daughters earned a D and a B in college classes through the dual enrollment program, which would have lowered her high school grade point average. Over the objections of some school administrators, including Ken Harper ("Harper"), the assistant principal at the Thomas County High School, Plaintiff re-interpreted the dual enrollment policy and directed that grades from such college courses would not be reflected on the high school transcripts even though the classes would still be counted for FTE funding. The following year, the school district resumed listing the grades from the college classes on high school transcripts. (District's SMF, ¶¶317-23; Deposition of Garry Kornegay, Doc. 80, pp. 191-98).

Ken Harper was also troubled by the school district's mentorship program. Students received course credits for participating in the program, which would also be used for calculating FTE status and funding, even though in some instances they were only serving as teachers' aides. Harper believed that, because the mentorship program was not providing students with academic instruction, it should not count for course credits or FTE status. Harper did not share his concerns with Plaintiff, because he was not confident that she would address the issue. However, during the 2009–2010 school year, he did disclose

his doubts to Streets and convey information about the program to her. (District's SMF, ¶¶282-85, 309-11; Deposition of Ken Harper, Doc. 79, pp. 68-71).

**B.    Plaintiff's Relationship with the Board**

Beginning in approximately 2009, Plaintiff became increasingly frustrated in her attempts to work with some members of the Board of Education. Plaintiff believed that she was better qualified than the board members to make decisions concerning educational policies. Admittedly, while Plaintiff was superintendent, reports on the Special Purpose Local Option Sales Tax ("SPLOST") were not always provided to the Board in a timely manner, and her last-minute changes to the agenda for several board meetings elicited complaints from board members. (Members' SMF, ¶18x; District's SMF, ¶134; Plaintiff Depo., pp. 157-58). Nevertheless, "in 2009 and 2010…the Board constantly micro-managed [her] personnel decisions and recommendations." (Plaintiff Declar., ¶204). Evans, Hiers, Morgan, and Streets, for instance, protested Plaintiff's refusal to alter the school district's policy for which students could walk in the graduation ceremonies. Because of conflicts such as this, Plaintiff thought that some board members were pursuing "personal agendas" rather than seeking the good of the school district. (District's SMF, ¶¶77, 91-92).

Plaintiff's relationships with specific board members became acrimonious over the course of her tenure as superintendent. Kay Streets is a registered

nurse who also serves on the Board of Education. Although initially supportive of Plaintiff, Streets came to disagree with several of the superintendent's decisions, including the refusal to deviate from the graduation policy and the elimination of the ROTC program. She also heard rumors that Plaintiff had referred to her as "uneducated," "rude," and "unprofessional," and she resented such disparaging comments. (Members' SMF, ¶¶8a, 8c). Streets perceived Plaintiff as being arrogant and untruthful in her interactions with the Board of Education. (Id. at ¶8d; District's SMF, ¶¶129-30).

Plaintiff admittedly has a low opinion of Streets. She considers Streets to be "crazy" and "not real rational" and believes that she, Plaintiff, is more qualified to make decisions regarding the administration of the schools. (Members' SMF, ¶¶18m-n, 18p).[2] She has also described Streets as rude and unprofessional, which is understandable given Streets's behavior in board meetings after 2009. During board meetings, Streets was hostile and belligerent to Plaintiff, and she would hum, roll her eyes, text, and make snide remarks. Plaintiff's husband actively campaigned for Streets's defeat in the board election in November 2010, and Plaintiff was disappointed when Streets prevailed. (Id. at ¶¶18k-l, 18o, 18u; District's SMF, ¶¶79, 84).

---

[2] Plaintiff has incorrectly numbered her responses to the Defendant Board Members' purportedly undisputed material facts, so that her response to one of the facts might be off by one or even two numbers. For instance, she has labeled as "16" her response to Defendant Board Members' Paragraph 18.

Plaintiff's relationship with Charles Evans also soured. Evans, a retired conservation ranger and member of the Board of Education, supported extending Plaintiff's contract in 2008, but he eventually ceased to like or trust her. He thought that she was an arrogant bully who tried to intimidate people. Evans opposed, among other things, Plaintiff's recommendation in her second year as superintendent to off-set a loss of funding by reducing the number of teachers. He began treating Plaintiff disrespectfully during board meetings. (Id. at ¶¶36, 126, 133, 194; Members' SMF, ¶¶9a-c, 9f-g, 18o, 18t).

Plaintiff reciprocated by losing confidence in Evans. She thought that Evans, like Streets, was crazy and irrational. No longer able to trust Evans, Plaintiff refused to meet with him unless there was a witness, and she began secretly recording her conversations with him. Plaintiff's husband actively campaigned for Evans's defeat in the November 2010 election for the Board of Education by recruiting candidates to run against him. Plaintiff hoped Evans would lose, and she attended a prayer vigil for the election at the request of Evans's opponent, Liz Owens. (Id. at ¶¶18m-w; District's SMF, ¶¶80-84, 87).

Even though Nancy Hiers voted in 2008 to extend Plaintiff's contract, she also came to dislike and mistrust the superintendent. She felt that Plaintiff had little respect for her and was not always truthful with the board members. Plaintiff's response to an incident with Jeanna Mayhall ("Mayhall") particularly

troubled Hiers. Mayhall, a principal in the school district, had emailed a student's parent using the email account belonging to one of the teachers in her school. The Board of Education asked Plaintiff to place a letter of reprimand in Mayhall's personnel file, but when Hiers subsequently requested to see Mayhall's file, Plaintiff never provided it to her. Hiers believed that Plaintiff refused to provide the file because she had never inserted the letter of reprimand. Hiers came to think that the school district and the Board had become divided between Plaintiff's supporters and opponents, which damaged morale. After voting not to renew Plaintiff's contract, Hiers apologized to the administrator for having publicly stated earlier that one of her purposes in running for re-election was to remove Plaintiff from office. (Id. at ¶¶128, 189-90; Members' SMF, ¶¶10a-e; Plaintiff Depo., pp. 88-89).

Plaintiff's relationship with Scott Morgan also worsened. Morgan first joined the Board of Education in January 2009, and he was its chairman in February 2011 when it decided not to renew Plaintiff's contract as superintendent. Cecil Stewart had been Morgan's opponent during the board election, and Plaintiff had assisted Stewart's campaign by verifying facts listed on a campaign postcard. During board meetings, Morgan regularly referred to Plaintiff as "management," which was perceived as insulting by Plaintiff. Over time he lost trust in her ability to be truthful with the Board and effectively administer the school system.

Morgan read a SPLOST audit in which Plaintiff claimed to have made timely reports to the Board, which he knew to be untrue. He also believed that she micro-managed details of the school system that could have been delegated to an assistant. He became concerned by the loss of students in the county school system during Plaintiff's tenure and felt that the TEMS program should have been discarded more quickly than it was. (Id. at ¶¶13a-e; District's SMF, ¶¶85-86, 90, 197a-e; Deposition of Scott Morgan, Doc. 64, pp. 21-23).

Board member Mark NeSmith had also lost confidence in Plaintiff by February 2011 when the Board voted on renewing her contract. Like Morgan, NeSmith was concerned by the drop in student enrollment for the County School District. He was also displeased that the historical separation in student test scores between the county and city school systems had narrowed. NeSmith thought that Joe Sharp ("Sharp"), the principal at the county high school, was weak and needed to be replaced. Furthermore, NeSmith felt that there was poor communication between the superintendent's office and the school principals and that Plaintiff's hiring an effective assistant superintendent would improve matters. However, Plaintiff never proposed a candidate for the position who was acceptable to NeSmith. (Members' SMF, ¶¶12a-e; District's SMF, ¶¶187-88).

Plaintiff's employment contract stated that the Board of Education was to provide her with an evaluation in June 2010, although it was not actually given to

her until December 2010. The 2010 evaluation listed Plaintiff's responsibilities as, among other things, supervising and evaluating assistants; overseeing the planning and evaluation of curriculum and instruction; communicating the Board's beliefs, vision, and mission to school personnel; recommending actions and alternatives to the Board; acting as a liaison between the Board and school personnel; and implementing comprehensive budget preparation. (District's SMF, ¶¶111-12, 114). The evaluation method used by the Board numerically rated Plaintiff on objective and subjective factors. An example of an objective factor would be students' test scores, while the subjective factors included Plaintiff's leadership and management qualities. The numerical ratings fell into the descriptive categories, from worst to best, of "Unacceptable," "Needs Improvement," "Satisfactory," "Valued Performer," and "High Performer." For the subjective factors, Morgan and NeSmith rated Plaintiff as "Satisfactory," while Streets, Evans, and Hiers rated Plaintiff as "Needs Improvement." The Board's total rating of Plaintiff's performance using the subjective factors placed it in the "Satisfactory" category. (Plaintiff Declar., ¶¶44-46, 48, 51, 59, 61, 63; 2010 Evaluation, Doc. 85-1. Ex. 1 to Plaintiff Declar.).

### C.    The Board's Vote on Renewing Plaintiff's Contract

By January 2011, the Board had become divided over whether to renew Plaintiff's contract. Board members were unhappy with the school district's

declining enrollment, poor communication, low morale, and the uneven implementation of various programs. Some board members were particularly desirous that Plaintiff hire a qualified assistant to reduce the number of people reporting directly to her and to serve as a liaison with the school administrators. During the 2010–2011 school year, Plaintiff had at least sixteen people reporting directly to her.[3] Despite the board members' lack of consensus, they agreed to let Morgan see if he could craft a compromise in which Plaintiff would serve for another year so long as she provided the Board with an acceptable reorganization plan, including an assistant superintendent. (District's SMF, ¶¶124-31, 136-39, 148-50; Morgan Depo., pp. 22-24).

Beginning in December 2010, Morgan and NeSmith began sharing with Plaintiff their worry that she was becoming too involved in the details of the school district to be able to serve as an effective leader. Right up until the Board's vote on February 8, 2011, Morgan and NeSmith had multiple

---

[3] Plaintiff denies this fact but provides no evidence that would place it in dispute. This is a repeated problem in Plaintiff's responses to the County School District's and Defendant Board Member's statements of material facts. She frequently denies a fact without actually providing admissible evidence to contest it. Her declaration's naked assertion of facts about which she could have no personal knowledge is insufficient to do so. Thus, under Local Rule 56, facts which Plaintiff has not denied with relevant citation to admissible evidence are deemed admitted. In an earlier Order (Doc. 99), this Court observed that Plaintiff's "first responses to the statements of material fact sufficiently complied with Local Rule 56," but this comment was in reference to Plaintiff's concerns about the form of her responses, not whether their substantive content created genuine disputes of material fact.

conversations with Plaintiff[4] encouraging her to hire an assistant with a strong personality to help her in dealing with the challenges the district faced. NeSmith met with Plaintiff on January 24, 2011 and suggested that she hire an assistant superintendent, someone who could serve as an "ax man," in his words. NeSmith recommended Plaintiff consider Lee Bailey ("Bailey"), a male administrator at the county high school, for the position. Plaintiff did not consider Bailey to be qualified for the job, although he later became the superintendent for the Grady County, Georgia school system. (District's SMF, ¶¶158-61, 177-78; Deposition of Mark NeSmith, Doc. 66, pp. 61-62; Plaintiff Declar., ¶¶65-69; 1/24/11 Transcription, Ex. 2 to Plaintiff Declar., pp. 18-20).

Two or three weeks before February 8 when the Board was scheduled to vote on Plaintiff's contract, NeSmith received a telephone call from Scott Barrett ("Barrett"), whose daughters were students in the Thomas County School District. Barrett had heard rumors that NeSmith intended to vote against renewing Plaintiff's contract because of her gender, and he wanted to know how the board member intended to vote. Although NeSmith told Barrett that "it's time to put a man in there," referring to the superintendent position, he said that he was leaning toward voting for Plaintiff although he had not made a final decision. When NeSmith and Barrett discussed the vote again about a week later, the

---

[4] Plaintiff secretly recorded three of their conversations. She has attached to her declaration what she describes as accurate transcriptions of the conversations. Defendants have not contested the accuracy of the transcriptions.

board member did not mention anything about Plaintiff's gender. (District's SMF, ¶¶218, 221-24; Deposition of Scott Barrett, Doc. 63, pp. 23-34).

On January 26, Plaintiff met with NeSmith and Morgan, when they again emphasized the Board's desire that she select an assistant superintendent. Morgan described this person as serving as a "hatchet man," later changing the term to "hatchet person." At one point during the conversation, when referring to the person who would be the assistant superintendent, Morgan used the term "guy." Morgan underscored that they did not want Plaintiff to hire another administrator, but rather someone who could further the reorganization of the district's central office. Morgan floated the possibility of having the assistant superintendent also oversee curriculum in the school system. Plaintiff told Morgan and NeSmith that Tonya Johnson, a school principal in the district, was the only person already working in the school district who she believed would be qualified as an assistant superintendent. To which NeSmith replied that "the person mentioned was not Tonya Johnson, it was Lee Bailey." (Plaintiff Declar., ¶¶72-80; 1/26/11 Transcription, Ex. 5 to Plaintiff Declar., pp. 16-30; Plaintiff Depo., pp. 38, 96). After Morgan clarified that the Board was not forcing Plaintiff to make changes to the school system she was uncomfortable with, only trying "to help you have some other tools to do some things so it takes some pressure off you," such as reorganizing the central office, the following colloquy took place:

Plaintiff: I've got, I mean, you know, I can look at the real issue—if you're saying it's not a new position, it's a reorganization, I can—

Morgan: I can't, I can't in good conscience vote for something that included another administrative position.

Plaintiff: Well, I mean, the way it looks, you know, if you have somebody here, in looking at the people we have everywhere, I'm always doing that, I'm always looking at how we can shift people. I would never have shifted—Trista [Jones to become principal at Cross Creek Elementary School] if I didn't feel there was any real need for her at that middle school.

Morgan: I had no problem with Trista, I told you that.

Plaintiff: And Clay [a male who become assistant principal at Cross Creek], you know, has have [sic] been a great team over there—

NeSmith: I've been asking you to put a guy over there for years.

Plaintiff: I'm constantly you know, looking at that and sometimes I am uncomfortable with something like that and I go what—I'm going to make every sort of—

Morgan: Well, you know, this is not a very typical thing to do and I take this personally—what about a guy in this position? And I'm just saying, you know, when my wife thinks that same thing…. And I'm just being honest about that, you know, a guy will—and I was just thinking from the standpoint of an offset. That wasn't what the board said, I just, I just was putting that—

Plaintiff:     I mean, it's got to be somebody that's qualified to know and kind of be able to deal with the situation, I mean, it really does. I mean, because I think my integrity, is at stake—

Morgan:     And honestly ours is right now too.

(1/26/11 Transcription, Ex. 6 to Plaintiff Declar., pp. 63-65).

When Morgan and NeSmith met with Plaintiff again on February 4, she proposed reorganizing the central office by elevating three female district employees to curriculum specialists. Morgan and NeSmith disapproved of the plan, and Plaintiff ultimately said, if she had to have only one assistant superintendent, then she would want Jeneane Weir, the director of a program for special-needs students. Morgan replied, "We have no males in the school system?" Plaintiff responded by mentioning the names of two male employees in the school system, but neither was well received by the board members. Morgan eventually cited the city school system, which had a female superintendent and a male assistant superintendent, as one that had a strong, effective assistant superintendent. Later in the conversation, Morgan mentioned Kathy Keown, an administrative director in the central district office, as a possible assistant for Plaintiff, but he deferred to Plaintiff's greater knowledge of the employee.[5] NeSmith never told Plaintiff that he would not consider a female in the assistant superintendent position, and Morgan never told her that he would not vote to

_____

[5] Plaintiff denies this fact, but the transcription of the February 4 conversation shows that Morgan did mention Keown as a candidate.

renew her contract because she did not propose a male assistant superintendent. (District's SMF, ¶¶174, 180; Plaintiff Depo., pp. 38, 96, 127; Plaintiff Declar., ¶¶88-90, 92-95; 2/4/11 Transcription, Ex. 7 to Plaintiff Declar., pp. 33-50, 59, 67-68, 80-84).

After meeting with Morgan and NeSmith and prior to the Board's vote on February 8, Plaintiff submitted a revised reorganization plan to the Board. On February 7, Plaintiff emailed Morgan a proposal to reorganize the central office by creating two curriculum positions that would be filled by Jeneane Weir and Tonya Johnson. That same day, to determine what options the Board would have at its disposal, Morgan emailed Plaintiff to gauge her willingness to accept a one-year contract if she were offered it. She never informed Morgan that she would accept such an offer. On February 8, just before the Board voted on whether to renew her contract, Plaintiff was given five minutes to present her reorganization plan to the Board. Rather than having only one assistant superintendent, Plaintiff's final proposal consisted of two curriculum officers and four directors over various areas. Thus, Plaintiff would be receiving six direct reports. (Plaintiff Declar., ¶¶100-01; District's SMF, ¶¶153-58, 204-06, 211).

By a 5–2 vote, the Board decided not to renew Plaintiff's contract. The Defendant Board Members voted against renewal, with Johnny Bannister and Frank Warr voting for renewal. After the vote, Morgan offered to serve as a

reference for Plaintiff. When she asked him why he voted against her, he said, "Frankly, I didn't like your plan." (Members' SMF, ¶6; Plaintiff Declar., ¶37; District's SMF, ¶199). As will be addressed below, the Defendant Board Members state various reasons, often unique to each person, for deciding not to keep Plaintiff as superintendent, but they do not say that they did so because of Plaintiff's sex or in retaliation for her refusing to hire a male as an assistant. (Members' SMF, ¶¶8-13). About a month after the vote, Hiers told Carol Gerald, who was Plaintiff's administrative assistant, that she voted against Plaintiff because the superintendent refused to change anything and "needed a strong male to work under her to handle problems, someone who could get tough with these people that are causing problems." (Declaration of Carol Gerald, Doc. 85-10, ¶¶2-7). Although Plaintiff's contract as superintendent ran through the end of June 2011, she worked out an agreement with the Board to leave the school system after May 31, 2011. (District's SMF, ¶¶41, 43-44).

### D. Developments after the Non-renewal Vote

In hiring a new superintendent, Morgan wanted the Board to be as transparent as possible, so he hired the Georgia School Board Association ("GSBA") as an outside firm to review and rank the candidates for the position. The GSBA grouped the applicants into three tiers, and none of the applicants who ultimately made it into the top tier were female. A committee of individuals

from the school district was then formed to screen the applicants from the top tier and individually rank them. Joe Sharp, who was then the principal of the Thomas County High School, served on the committee and ranked Garry Kornegay as the top applicant for superintendent. No one from the Board told the GSBA or Sharp to choose a male as superintendent. The committee eventually named the top-ranked candidates, who were interviewed by the Board. Kornegay was hired to replace Plaintiff. (District's SMF, ¶¶237-46; Morgan Depo., pp. 159-64).

Kornegay became the Thomas County superintendent on July 1, 2011. He observed that employee morale in the district was low because, he believed, the staff was divided between Plaintiff's supporters and her opponents. School administrators related various complaints about Plaintiff to Kornegay. He also discovered that the district's organizational chart had all of the directors and principals reporting directly to the superintendent, which he changed to a more tiered structure. (District's SMF, ¶¶247-49, 251, 253).

Kornegay soon learned of several things that troubled him about Plaintiff's tenure as superintendent. He found that, upon leaving the superintendent's position, Plaintiff had taken flash drives and recorders from her office and downloaded documents from her work computer before directing that its hard drive be cleared. School counselors also told Korengay details about how the mentorship and dual enrollment programs had been run, which he felt might have

involved ethical violations. After receiving documents about the programs from Harper, Streets had earlier shared them with Morgan as chairman of the Board. Not knowing what to make of the programs, Morgan had sent the documents to the Georgia Professional Standards Commission ("PSC") in early 2010. (District's SMF, ¶¶273-75, 282-84, 286-88, 293). The PSC accredits Georgia educators, disciplines their misbehavior, and promulgates a code of conduct for them. The PSC's code of conduct mandates that school administrators report possible ethical violations within ninety days after any internal investigation into the behavior is concluded. (Deposition of John Grant, Doc. 77, pp. 30-32).

After her contract with the Thomas County School District expired, Plaintiff moved to Oconee County, Georgia with her family. While still attending the Thomas County High School, one of Plaintiff's daughters had been in the school band, which Plaintiff believed should have counted as a fitness credit. After learning that her daughter's transcript did not reflect a fitness credit for the band participation, Plaintiff emailed Joe Sharp and asked that her daughter's transcript be revised, which would be provided to her daughter's new school in Oconee County. Sharp complied with Plaintiff's request. Kornegay learned about the altered transcript after the technology director at the Thomas County High School called him with concerns about what had occurred. (District's SMF, ¶¶295, 315; Deposition of Joe Sharp, Doc. 62, pp. 72-80).

On August 3, 2011, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") declaring that she had suffered gender discrimination and retaliation. She filed the charge after the County School District hired Kornegay as superintendent. She accused the school district of not renewing her contract because of her gender and in retaliation for her "opposing unlawful employment practices [only considering a male assistant superintendent], in violation of Title VII." (Plaintiff Declar., ¶212; Plaintiff's First EEOC Charge, Ex. 14 to Plaintiff Depo.).

In February 2012, Kornegay contacted the PSC to report possible ethical violations involving Plaintiff. The areas of concern for Kornegay were the mentorship and dual enrollment programs, the personal fitness credit for Plaintiff's daughter, and the possible removal of confidential information from her work computer. Kornegay had known about some of these issues since August 8, 2011. After hearing from Kornegay, the PSC sent its investigator, John Grant ("Grant"), to Thomas County. From February 22–24, 2012, Grant reviewed district records and met with various individuals. Grant found that there were probable cause of violations relating to the awarding of the personal fitness credit and the omitting of dual enrollment grades from high school transcripts. Grant submitted his findings to the PSC. Based on Grant's investigation, the PSC suspended Sharp's teaching license for twenty days for the violations at the high

school uncovered by Grant and recommended, subject to rebuttal, that Plaintiff's teaching license be suspended for ninety days for her "[c]onspiring to falsify official documents." Plaintiff filed for an injunction in the Fulton County Superior Court to stop the suspension, arguing that the PSC had no authority to investigate her because the County School District had never filed an official complaint against her. She also made a second charge with the EEOC, claiming that the school district was retaliating against her for the first charge by, among other things, reporting her to the PSC. (District's SMF, ¶¶296-300, 308, 330-35; Grant Depo., pp. 16-24, 106-09; Probable Cause Report, Doc. 77-5, Ex. 5 to Grant Depo.; PSC Letter to Plaintiff, Ex. 17 to Plaintiff Declar.).

Plaintiff sued the Thomas County School District in this Court on November 18, 2012 and in February 2013 moved to add the Defendant Board Members to the lawsuit. (Complaint, Doc. 1; Motion for Leave to File Amended Complaint, Doc. 19). She alleges that the County School District and the Defendant Board Members are liable for gender-based employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and 28 U.S.C. § 1983. She specifically contends that 1) the school district and the Defendant Board Members committed gender discrimination in violation of Title VII and the Equal Protection Clause by not renewing her contract and then hiring a male superintendent; 2) Defendants retaliated against her by

terminating her employment after she opposed an unlawful employment practice relating to hiring a male assistant superintendent; and 3) the school district retaliated against her after she filed her first charge of discrimination with the EEOC. According to Plaintiff, the County School District retaliated by a) accusing her of criminal activity and threatening legal action for clearing her work computer and copying materials from it; b) accusing her of stealing the hard drive to her computer and threatening legal action; c) filing charges against her with the Georgia PSC; d) disclosing confidential information about her daughters to the PSC; e) disclosing confidential information about her daughters to others; and f) causing false information about her to be published in the Thomasville Times-Enterprise on August 2, 2012.[6] (Amended Complaint, Doc. 19-1, ¶¶42-56).

## III.  Analysis

Defendants' motions for summary judgment are granted because the undisputed factual record shows that they are entitled to judgment as a matter of law. Defendants raise a number of arguments for why summary judgment is appropriate, but the Court need not address each of these arguments because Plaintiff has failed to establish her substantive claims.

---

[6] Plaintiff has not placed a copy of the article in the record, so the Court does not know what false information might have been in the article or who might have provided it.

### A.     Gender Discrimination Claims under Title VII and § 1983

Summary judgment is granted on Plaintiff's claim of gender discrimination under Title VII and § 1983. "Title VII and section 1983 claims have the same elements where the claims are based on the same set of facts," and in such cases the claims are subject to the same legal analysis. Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1275 n. 5 (analyzing alleged violations of Title VII and the Equal Protection Clause under the analytical framework provided by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Furthermore, because the County School District is liable on the gender discrimination claim only to the extent that the individual board members acted from discriminatory animus, *see* Matthews v. Columbia County, 294 F.3d 1294, 1297 (11th Cir. 2002), the discrimination claims against the County School District and the Defendant Board Members may be analyzed together.

A plaintiff may establish a claim of unlawful employment discrimination through either direct or circumstantial evidence. *See* Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330-31 (11th Cir. 1998). "To qualify as direct evidence of discrimination…a biased statement by a decision-maker [must] be made concurrently with the adverse employment action, such that no inference is necessary to conclude that the bias necessarily motivated the decision." Williamson v. Adventist Health Sys./Sunbelt, Inc., 372 F. App'x 936, 940 (11th

Cir. 2010) (citing <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1359 (11th Cir. 1999)). This is a "rigorous standard." <u>Damon</u>, 196 F.3d at 1359. "An example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'" <u>Id.</u> (internal quotation and citation omitted). If a plaintiff is able to produce direct evidence of discrimination, the "burden of persuasion then shifts from the employee to the employer, who must rebut the direct evidence of discrimination by affirmatively proving that it would have made the same decision even if it had not taken [gender] into account." <u>Ferrill v. Parker Group, Inc.</u>, 168 F.3d 468, 472 (11th Cir. 1999).

Although Plaintiff contends that there is direct evidence that four of the five Defendant Board Members voted not to renew her contract because she is a woman, she is mistaken. The closest Plaintiff comes to demonstrating direct evidence is with NeSmith's telephone conversation with Scott Barrett two–three weeks before the vote on renewing Plaintiff's contract.[7] According to Barrett, NeSmith said in reference to the superintendent's position that "it was time to put a man in there." This statement, despite its superficial appearance, is not direct evidence of gender discrimination because it was not made concurrently with the

---

[7] For the other Defendant Board Members, Plaintiff only has evidence that they considered gender with regard to positions other than the superintendent office, requiring the inference that any discriminatory intent reflected in the evidence was also at play in the decision not to renew Plaintiff's contract. Such evidence can only be seen as circumstantial. *See* <u>Wright v. Southland Corp.</u>, 187 F.3d 1287, 1294 (11th Cir. 1999) (direct evidence "ties the discriminatory attitude to the relevant employment decision").

non-renewal. During the same conversation NeSmith told Barrett that he had not yet decided how to vote. They had a later conversation in which NeSmith never mentioned Plaintiff's gender, and Plaintiff herself testified that she believed NeSmith was going to vote for renewal until he heard her reorganization plan on the day of the vote. NeSmith's statement is direct evidence that he was improperly considering gender several weeks prior to the vote, but a factfinder would have to infer that gender was the factor that ultimately persuaded him to vote against Plaintiff. Such evidence is, by definition, circumstantial. Burrell v. Bd. of Trustees of Ga. Military Coll., 125 F.3d 1390, 1393-94 (11th Cir. 1997).

Supported only by circumstantial evidence, Plaintiff's gender discrimination claim is subject to the burden-shifting analytical framework set forth by the Supreme Court in McDonnell Douglas, 411 U.S. at 802-04. A plaintiff must first establish a *prima facie* case for her claims. Brooks v. Cnty. Com'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006) (citing McDonnell Douglas). If she is able to do so, the burden shifts to the defendant "to produce evidence that its action was taken for a legitimate, non-discriminatory reason." Id. If there is evidence of a lawful reason for the adverse employment action, the court's "inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." Id. (internal citations and quotations omitted). Here, Defendants have conceded that

Plaintiff is able to make out a *prima facie* case for gender discrimination,[8] so the Court will proceed to the second step of the <u>McDonnell Douglas</u> analysis.

> **1.  Whether Defendants have proffered legitimate reasons for why the Defendant Board Members did not renew Plaintiff's employment contract**

Because Plaintiff has established a *prima facie* case of gender discrimination, Defendants must now shoulder the burden of producing nondiscriminatory reasons for not renewing Plaintiff's contract. They do not have to convince the Court that they were actually motivated by the proffered reasons, only that a reasonable factfinder could conclude from the evidence that they "had *not* been motivated by discriminatory animus." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (emphasis in <u>Combs</u>). All of the Defendant Board Members have produced evidence that they decided not to renew Plaintiff's contract for lawful reasons, which also provides the school district with a non-discriminatory explanation for the action.

Kay Streets provides the following explanations for voting against renewing Plaintiff's contract: Plaintiff allegedly provided false information to the Board of Education in recommending that the ROTC program be cut; she had made disparaging remarks about Streets; she was arrogant and condescending to the

---

[8] Although the Thomas County School District maintains that Plaintiff has not proven a *prima facie* case of gender discrimination, it has not articulated an argument in support of this contention, effectively conceding the point.

board members; her oversight of changes in the grading and TEMS systems revealed ethical issues because she had made these changes to benefit her daughter's grades, according to rumors; the county high school was receiving state funds for classes that involved little work or whose grades were not reflected on students' transcripts; and she showed little improvement during her tenure compared to the goals set out in the 2009 Letter of Understanding.[9] (Members' SMF, ¶8). There is ample evidence in the record from which a reasonable jury could conclude that Plaintiff made negative comments about Streets, was arrogant and condescending toward the board members, and had failed to improve in her performance as superintendent. These were lawful reasons for not renewing Plaintiff's contract, so Streets has met her burden under the McDonnell Douglas analysis.

Charles Evans gives the following reasons for opposing the renewal of Plaintiff's contract: he could no longer trust what she told him; he disagreed with her decisions to fire teachers as part of budget cuts and to take away duty-free lunches from some middle-school teachers; he disliked her last-minute changes to the agendas for board meetings and questioned her motives for doing so; he thought she improperly used school resources in an attempt to defeat his re-election campaign to the Board and injected herself into other board elections;

---

[9] The Court refrains from addressing reasons proffered by the Defendant Board Members for which there is not support in the undisputed factual record.

and he had a poor working relationship with her. (Members' SMF, ¶9). There is clear evidence that Plaintiff and Evans had ceased to trust each other or work productively together. Plaintiff gave testimony in her deposition that Evans disliked her decision to fire teachers as part of budget cuts and that board members complained of her changes to the agendas for board meetings. Moreover, a reasonable factfinder could certainly determine that a board member could be concerned by Plaintiff's and her husband's involvement in board elections. Evans has met his burden because these are legitimate reasons to have not renewed Plaintiff's contract.

Nancy Hiers offers these reasons for her vote: she was frustrated by the constant bickering, unpleasant board meetings, and poor morale in the school system; she was told that some teachers were unhappy with Plaintiff's leadership and had decided to leave their schools; she believed that Plaintiff had divided the school system; she thought that Plaintiff had ignored the Board's instruction to place a letter of reprimand in Jeanna Mayhall's personnel file; she believed that Plaintiff was untrustworthy; she did not think that Plaintiff respected her as a person; and she had heard that Plaintiff had arranged for her daughter's grade in a dual-enrollment college course to be removed from the high school transcript. (Id. at ¶10). There is ample evidence indicating that the school system was divided, bickering was a problem, the board meetings were unpleasant, and

Plaintiff had little respect for some board members. Because these were legitimate grounds for ending Plaintiff's employment, Hiers has met her burden.

Mark NeSmith provides the following reasons for his vote to not renew Plaintiff's employment: the number of students the school system lost during Plaintiff's tenure; the student test scores in the city school system were improving at a faster rate than in the county schools; Joe Sharp was a weak principal at the county high school; poor communication between the high school administrators and the central district office; and Plaintiff's failure to recommend a candidate who would, in NeSmith's opinion, have been able to bridge the communication gap. (Id. at ¶12). There is evidence that the county school system lost students and funding during Plaintiff's tenure, student test scores in the city school system were gaining ground on scores in the county schools, and NeSmith wanted Plaintiff to hire a strong assistant but was unhappy with her recommendations. Given that these were non-discriminatory reasons for voting against renewing Plaintiff's contract, NeSmith has discharged his burden.

Scott Morgan states these reasons for his vote: he stopped trusting Plaintiff to provide full and accurate information to the Board of Education; the school system had lost students, and consequently state funds, during Plaintiff's tenure; he believed that she was micro-managing issues, which prevented her from being an effective manager; he thought that the TEMS program should have

been discarded earlier than it was; he felt that Plaintiff had poorly implemented several of the programs that were introduced into the school district; and he disagreed with her plan for reorganizing the central district office. (Id. at ¶13). Because Plaintiff frequently changed the agendas for board meetings at the last minute, failed to make several SPLOST reports on time, and on several occasions admitted to the Board that she had been wrong, a reasonable factfinder could determine that Morgan no longer trusted Plaintiff. It could also find that he believed her micro-management of issues prevented her from being an effective leader and the TEMS program should have been discarded earlier. There is also some evidence that he disagreed with Plaintiff's proposal for reorganizing the central office for the county school system. These were lawful reasons for not renewing Plaintiff's contract, so Morgan has met his burden.

### 2.   Whether Plaintiff has shown Defendants' proffered reasons for not renewing her contract to be pretextual

Because the Defendant Board Members have proffered non-discriminatory reasons for not extending Plaintiff's contract, to defeat summary judgment she must demonstrate that these reasons were merely pretexts for discrimination. She could do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." Burdine, 450 U.S. at 256. She must produce sufficient evidence "to permit a reasonable factfinder to

conclude that the reasons given by the employer were not the real reasons for the employment decision." Combs, 106 F.3d at 1528. Plaintiff has not done so.

First, Plaintiff has not produced sufficient evidence from which a reasonable jury could decide that the Defendant Board Members' non-renewal votes were more likely motivated by her gender than by their proffered reasons. The only evidence anyone on the Board of Education considered Plaintiff's gender is NeSmith's conversation with Barrett, but this occurred several weeks before the non-renewal vote, and NeSmith said that he had not yet decided how to vote. Moreover, Streets joined in the original vote to hire Plaintiff as superintendent and, along with Evans and Hiers, in 2008 voted to extend her contract. While these facts are not determinative, they hardly support the conclusion that the Board did not renew Plaintiff's contract in 2011 because of her gender. Furthermore, she served as superintendent in Thomas County a year longer than she considers to be typical for Georgia superintendents. Certainly Plaintiff experienced conflict with board members during her time as superintendent, but the Court cannot conclude from this fact alone that they were discriminating against her because she is a woman.

Second, Plaintiff has not shown that the Defendant Board Members' proffered reasons for not renewing her employment are unworthy of being believed. She focuses her argument in this regard on how the Defendant Board

Members evaluated her in December 2010 and the fact that, just before the non-renewal vote, the Board offered to extend her contract by a year if she hired a strong assistant superintendent. Far from conflicting with the Defendant Board Members' testimony that they believed Plaintiff had divided the school system, was micro-managing issues, and was not adequately communicating with school administrators, the December 2010 evaluation indicates that the members thought that her leadership left something to be desired. The subjective factors on the evaluation included Plaintiff's leadership and management qualities. For the subjective factors, Morgan's and NeSmith's ratings fell into the middle or "Satisfactory" category, while Streets, Evans, and Hiers rated Plaintiff as "Needs Improvement." Placing Plaintiff's leadership in the middle category, as Morgan and NeSmith did, suggests that they viewed her work as average, hardly the sort of glowing approval that would cast doubt on their proffered reasons for not keeping her as superintendent.

The offer to extend Plaintiff's contract by a year also fails to undermine the Defendant Board Members' explanations for their votes. There is evidence that not all of the Defendant Board Members even supported making the offer,[10] but in any case the offer was conditioned on Plaintiff's being able to recommend a

---

[10] For instance, Streets denies that, in the final analysis, she would have voted for renewing Plaintiff's contract for another year even if an acceptable candidate for assistant superintendent had been proposed. (Deposition of Kay Streets, Doc. 65, pp. 59-60).

candidate to serve as a strong assistant superintendent, which she did not do to the Board's satisfaction. Furthermore, the proposal itself hardly served as a ringing endorsement of Plaintiff's abilities. Morgan and NeSmith testified that they viewed the one-year offer, when joined with the hiring of a strong assistant superintendent, as a compromise measure that would lead to unity and stability on the Board of Education moving forward. (Morgan Depo., pp. 23-26; NeSmith Depo., pp. 54-58).

There is considerable evidence in the record to support the Defendant Board Members' avowed reasons for not renewing Plaintiff's contract. Her relationships with Evans and Streets had disintegrated to the point that she considered them to be "crazy" and they treated her disrespectfully during board meetings. Plaintiff began secretly recording her conversations with some Defendant Board Members, whom she viewed as having "personal agendas." Student enrollment in county schools had declined, and the city school system was narrowing the gap in student test scores. Because Plaintiff has not provided sufficient evidence to allow a reasonable factfinder to doubt the Defendant Board Members' proffered reasons for not keeping her as superintendent, the Court dismisses her claims of gender discrimination against them and the Thomas County School District.

### B.    Retaliation Claims

Plaintiff's retaliation claims also fail the summary judgment standard. At the outset, the Court must dismiss all of Plaintiff's retaliation claims against the Defendant Board Members. Plaintiff alleges that the Defendant Board Members did not renew her contract in retaliation for her refusal to comply with their demand for a male assistant superintendent, but whether she has brought her claims under Title VII or § 1983 is difficult to discern from her Amended Complaint.   (*See* Amended Complaint, ¶¶33, 55). If she asserts that the Defendant Board Members are liable under Title VII, then her claims must be dismissed because "[t]he relief under Title VII is against the *employer*, not individual employees whose actions constitute a violation of the Act." Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) (emphasis in original); *see also* Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000). If she claims that the Defendant Board Members violated the Equal Protection Clause and are liable under § 1983, then qualified immunity protects them. In voting on whether to renew Plaintiff's contract, the board members were performing a discretionary function of their office. *See* Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004).   Seeing that "no clearly established right exists under the equal protection clause to be free from retaliation," Ratliff v. DeKalb Cnty., Ga., 62 F.3d 338, 340 (11th Cir. 1995)

(emphasis omitted), Plaintiff is not able to overcome the Defendant Board Members' qualified immunity on the retaliation claims.

Plaintiff also alleges that the Thomas County School District is guilty of various forms of retaliation in violation of Title VII. She asserts that there is direct evidence that the school district, via the votes of the Defendant Board Members, declined to renew her contract in retaliation for her refusing to only consider male candidates for the assistant superintendent position. As shown below, the evidence Plaintiff adduces in support of her position does not qualify as direct evidence, so this claim, as with her other retaliation claims, is supported by circumstantial evidence only. The McDonnell Douglas burden-shifting analysis applies to Title VII retaliation claims based on circumstantial evidence. Adams v. Cobb Cnty. Sch. Dist., 242 F. App'x 616, 620 (11th Cir. 2007). Although Plaintiff is able to make out a *prima facie* case for some of her retaliation claims, she is not able to establish that the County School District's explanations for the allegedly retaliatory actions are pretexts for discrimination.

### 1. Whether the County School District violated Title VII's anti-retaliation provision by not renewing Plaintiff's employment contract

Turning to Plaintiff's claim that the County School District did not renew her contract in retaliation for her refusal to hire a male assistant superintendent, the Court must first consider whether there is direct evidence of retaliation or only

circumstantial evidence. As examples of direct evidence, Plaintiff points to occasions when Morgan, NeSmith, and Evans referred to the type of assistant superintendent that they wanted as an "axman" or "hatchet man." Contrary to Plaintiff's perception, these terms are not gender-specific, especially given that the board members wanted someone with a strong, forceful personality. A "hatchet man" is, *inter alia*, "a person whose job is to do harsh and unpleasant things that other people do not want to do."[11] Similarly, the definitions of "axman" include "a person who makes cuts in expenditure or services, esp[ecially] on behalf of another."[12]

Plaintiff argues that other comments by Morgan and NeSmith were also direct evidence of retaliation, but she is mistaken. NeSmith suggested that Plaintiff hire Lee Bailey as her assistant and said "I've been asking you to put a guy over there [at Cross Creek Elementary School] for years." However, there is no evidence that NeSmith wanted Bailey solely because of his gender, and a number of inferences are required to get from the elementary school to the assistant superintendent position. As for Morgan, he did ask Plaintiff if the school system had qualified male employees who could be the assistant superintendent and suggested "what about a guy in this position?" Morgan also told Plaintiff that

---

[11] MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/ hatchetman?show=0&t=1405544170 (last visited July 16, 2014).

[12] DICTIONARY.COM, http://dictionary.reference.com/browse/axman?&o=100074&s=t (last visited July 16, 2014).

he did not like her reorganization plan. Although these comments might be evidence of Morgan's general perceptions of gender, they are not direct evidence that he ever threatened Plaintiff with voting against renewal of her contract if she did not hire a male assistant superintendent or actually did so. Inferences from this evidence would be required to reach such conclusions. The fact that Morgan suggested Kathy Keown as the assistant superintendent works against the notion that he retaliated against Plaintiff for not recommending a man.

Plaintiff's last example of purportedly direct evidence relates to Nancy Hiers. After voting against renewing Plaintiff's contract, Hiers told Plaintiff's administrative assistant that she did so because she "felt that Dr. Quigg needed a strong male to work under her to handle problems…." For this statement to be evidence of retaliation, it must be inferred that, one, Hiers knew Plaintiff had refused to hire a male and, two, she had voted against renewal to retaliate for Plaintiff's refusal. One could also interpret the comment as indicating that, while Plaintiff required a strong male assistant, some other superintendent would not, and the school district consequently needed a different superintendent. Hiers's comment is, at best, circumstantial evidence of retaliation.

Thus, there is no direct evidence that Plaintiff's contract was not renewed in retaliation for her not hiring a male assistant superintendent, only circumstantial evidence. This claim is, therefore, subject to the McDonnell

<u>Douglas</u> test. The claim fails because Plaintiff is unable to establish a *prima facie* case, but even if she could, the school district offers—through the Defendant Board Members—legitimate, non-pretextual explanations for not renewing her contract.

To establish a *prima facie* retaliation claim, Plaintiff must show "that (1) [she] engaged in statutorily protected conduct; (2) [she] suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." <u>Brungart v. Bellsouth Telecomms., Inc.</u>, 231 F.3d 791, 798 (11th Cir. 2000) (citing various cases). There is no evidence that Streets, Hiers, or Evans knew, when they voted against renewing Plaintiff's contract, that she had refused to violate the law by only considering a male assistant superintendent. Their three votes, even setting aside the votes of Morgan and NeSmith who had spoken with Plaintiff, would still have been sufficient to defeat the two votes in favor of renewing her contract. Thus, there is no causal connection between Plaintiff's refusal to recommend an acceptable candidate to the Board—the purportedly protected conduct under Title VII—and the non-renewal of her contract.

Even assuming that Plaintiff could establish a *prima facie* case for this retaliation claim, the County School District, by way of the Defendant Board Members, has offered lawful reasons for not renewing Plaintiff's contract that a

40

reasonable jury could not consider to be pretexts for discrimination. The school district's proffered reasons for the non-renewal, as provided by the board members, have already been analyzed in Part III(A) of this Order. As with the gender discrimination claim, these reasons suffice to defeat the retaliation claim as well. Thus, the Court need only briefly comment on the circumstantial evidence that the non-renewal was a retaliatory action.

When closely scrutinized, the evidence of retaliation is insufficient to convince a reasonable factfinder that the proffered reasons for non-renewal were pretexts for retaliation. First, there is no evidence at all that Evans and Streets voted in retaliation. Second, even if this Court were inclined to perceive Hiers's comment that Plaintiff "needed a strong male to work under her" as evidence of retaliation, and it is not, in the same conversation Hiers had said that she voted for non-renewal because Plaintiff had not changed anything. These comments hardly suffice to call into question Hiers's proffered reasons for her vote, which are buttressed by undisputed evidence. Third, NeSmith's eagerness for Plaintiff to hire Bailey hardly indicates retaliatory motives, and it certainly does not overcome NeSmith's explanations for his vote on renewing Plaintiff's contract. Fourth, in the same conversation in which Morgan suggested Plaintiff hire a male as assistant superintendent, he also suggested she consider Kathy Keown for the position. He had, furthermore, told Plaintiff that he wanted to hire a single

assistant superintendent rather than adding two administrative positions, but she insisted on keeping two positions in the reorganization plan that she ultimately presented to the board. Little wonder then that Morgan explained his vote to Plaintiff by saying, "Frankly, I didn't like your plan."

Plaintiff's claim that the County School District did not renew her contract in retaliation for her declining to hire a male assistant superintendent is dismissed. She has not established a *prima facie* case for this claim, and she certainly has not produced evidence that would cast doubt on the school district's proffered reasons for the non-renewal.

> **2.    Whether the County School District violated Title VII by accusing Plaintiff of criminal activity and then threatening legal action against her**

Plaintiff also claims that, after she filed her first charge with the EEOC, the County School District retaliated by falsely accusing her of criminal activity and threatening legal action. (Amended Complaint, ¶¶42(a)-(b)). The Eleventh Circuit has interpreted Title VII to require an employee bringing a retaliation claim to show that she suffered an "ultimate employment decision" such as a termination, failure to hire, demotion, or some other action that would substantially "alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)

(internal quotations, punctuation, and citations omitted). This claim must be dismissed because any accusations and threats by the County School District, whatever the motives behind them, did not rise to the level of an ultimate employment decision.

### 3.   Whether the County School District is liable for retaliation for reporting Plaintiff to the Georgia PSC and relating information about her daughters

Plaintiff also alleges that the County School District is guilty of retaliation when, after her EEOC charge, it reported her to the Georgia PSC and disclosed confidential information about her daughters during the subsequent investigation. The fact that Scott Morgan sent documents relating to Plaintiff to the PSC in early 2010 will not support a retaliation claim because this occurred well before August 3, 2011, when Plaintiff filed her first EEOC charge. The County School District did communicate with the PSC after the EEOC charge and assist in the investigation of the former superintendent, but the retaliation claim must be dismissed nonetheless.

Plaintiff does not contend that there is direct evidence the school district retaliated against her by reporting to, and cooperating with, the PSC, so her claim must be analyzed under the McDonnell Douglas standard. Neither Plaintiff's pleadings nor her brief opposing summary judgment identifies a decision-maker who decided to retaliate against her on behalf of the school

district, but any such decision presumably would have fallen to George Korneygay, the person who succeeded her as superintendent. The record shows that Kornegay assisted the PSC investigation, and, given his position, his actions could be imputed to the school district. The Court will assume that Plaintiff could establish a *prima facie* case of retaliation with respect to Kornegay's actions.

Nevertheless, because Korneygay has produced evidence that he assisted PSC's investigation for legitimate reasons, Plaintiff's retaliation claim must be dismissed because she has not established that Kornegay's reasons were pretexts for unlawful motives. Kornegay maintains that, after becoming superintendent, he discovered a number of irregularities that had occurred during Plaintiff's tenure which might have involved unethical behavior and which he felt ethically obligated to report to the PSC. He also reported that Plaintiff had contacted Joe Sharp about awarding her daughter a health and fitness credit for band participation, which was also a possible ethical violation. Given that the PSC found probable cause to discipline Plaintiff for some violations and that it recommended suspending her teaching license, there is evidence supporting Kornegay's explanation for his actions.

Plaintiff has not produced evidence to allow a reasonable jury to conclude that Kornegay's proffered reasons were pretexts for retaliation. Plaintiff admits that she asked an assistant to download files from her computer and clear its

hard drive just before her time as superintendent ended and that she contacted Sharp about the health and fitness credit. It is also undisputed that the other actions which Kornegay claims to have found troubling—taking state funds for classes in which students received course credit for serving as mentors and allowing high school students to receive dual enrollment for college classes without having the grades placed on their high  school transcripts—did take place while Plaintiff was superintendent. Nor is it disputed that the PSC investigated and found probable cause to suspend Plaintiff's license for ninety days based on her "[c]onspiring to falsify official documents." There is no evidence Kornegay or anyone else on behalf of the school district pressured PSC's investigation to reach a particular conclusion or even told the PSC about Plaintiff's EEOC charge. Thus, the circumstantial fact that Kornegay assisted the PSC's investigation after Plaintiff filed her first EEOC charge is too weak to create a jury issue for his motives. This retaliation claim is dismissed.

### 4.	Whether Plaintiff's remaining retaliation claims can survive summary judgment

Plaintiff's remaining retaliation claims must also be dismissed. She alleges that the County School District "unlawfully disclosed confidential and private information about [her] daughters to others" besides the PSC and that it "caused false information about [her] to be published in the Thomasville Times-Enterprise on August 2, 2012." (Amended Complaint, ¶¶42(e)-(f)). The fatal flaws, among

several, for these claims is that Plaintiff has not established who precisely took these alleged actions for the school district or whether this actor or actors even knew about her EEOC charges. Because Plaintiff cannot construct a *prima facie* case of retaliation for these claims, they are dismissed.

## IV.   Conclusion

Because of the foregoing reasons, the Motions for Summary Judgment (Doc. 57, 69) by the Defendant Board Members and the Thomas County School District are granted, and this case is dismissed.

**SO ORDERED**, this the 9th day of September, 2014.


                              *s/ Hugh Lawson*_____
                              **HUGH LAWSON, SENIOR JUDGE**
scr